# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* BHUVANA MANDALAPU, M.D., and RAMAKRISHNA CHAVA, M.D., relators, and on behalf of the STATES of California, Colorado, Florida, Georgia, Illinois, Indiana, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Mexico, New Jersey, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, and Washington, as well as the District of Columbia<br><br>Plaintiffs<br><br>v.<br><br>ALLIANCE FAMILY OF COMPANIES, LLC, SLEEP SOURCE, LLC, RESPIRATORY SLEEP SOLUTIONS, INC., JUSTIN MAGNUSON, and ANCOR HOLDINGS, L.P.<br><br>Defendants. | APR 17 2018<br><br>David J. Bradley, Clerk of Court<br><br>CIVIL ACTION NO.: 4:17-cv-740<br><br>HON. ALFRED H. BENNETT<br><br>**<u>FILED UNDER SEAL</u>**<br><br>**<u>DO NOT PLACE ON PACER</u>**<br><br>**<u>DO NOT PLACE IN PRESS BOX</u>**<br><br>**JURY TRIAL DEMANDED**<br><br>**QUI TAM COMPLAINT** |

## FIRST AMENDED *QUI TAM* COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE FALSE CLAIMS ACTS

### I. <u>INTRODUCTION AND SUMMARY OF ALLEGATIONS</u>

1. This *qui tam* action alleges violations of the federal False Claims Act, 31 U.S.C. § 3729, et seq. ("FCA"), and analogous state false claims acts by Defendants, the Alliance Family of Companies, LLC (hereinafter, "Alliance"); Sleep Source, LLC ("Sleep Source"); Respiratory Sleep Solutions, Inc. ("RSS"); Justin Magnuson ("Magnuson"), the President and Chief Executive Officer of Alliance, Sleep Source, and RSS; and Ancor Holdings, L.P. ("Ancor"), a private equity

1

firm that purchased the Alliance Family of Companies, LLC and/or its related entities (i.e. any parent companies and/or subsidiaries of Alliance) and now controls those entities. Alliance, Sleep Source, RSS, Magnuson, and Ancor are collectively referred to herein as "Defendants."

2. Alliance is the largest provider of neurological diagnostic services in the country. Alliance has directly, or through its various subsidiaries, billed government insurers thousands of times for, at the very least, tens of millions of dollars for electroencephalogram ("EEG") and sleep study services.

3. Sleep Source is a provider of diagnostic services including EEG and sleep study testing services. Sleep Source is a wholly-owned subsidiary of Alliance. Sleep Source exists, at least in part, to provide kickbacks to healthcare providers who refer patients to Alliance, RSS, and/or Sleep Source.

4. RSS is a provider of diagnostic services including EEG testing and sleep study services. RSS was, effectively, the former name of Alliance as well as a precursor corporate entity to Alliance.

5. Alliance, RSS, Sleep Source, Magnuson, and Ancor have violated the FCA and analogous state false claims laws by unlawfully paying healthcare providers across the United States hundreds of dollars for each government-insured patient they referred to Alliance, Sleep Source, and/or RSS for ambulatory EEG testing services or by conspiring to do so.

6. EEG testing is a specialized diagnostic test that records electrical activity in the brain and is most often employed to determine whether a patient suffers from seizures and, if so, the nature of such seizures.

7. Ambulatory EEG testing is a specific form of EEG test wherein the patient is recorded for a lengthy period of time (often a matter of days). The testing may occur at a patient's home.

8. Alliance, Sleep Source, and RRS perform ambulatory EEG testing, which is nearly always video-monitored and typically occurs at patients' homes. The tests Alliance, Sleep Source, and RSS perform usually run from three to five days.

9. Alliance, Sleep Source, and RSS bill the United States and the plaintiff-states thousands of dollars for each ambulatory EEG test that they perform on government-insured patients.

10. Defendants' scheme of paying physicians to induce them to refer government-insured patients to Alliance for ambulatory EEG testing services constitutes an illegal kickback in violation of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

11. Each claim that Defendants submit, or cause to submit, to the United States and the plaintiff-states, for ambulatory EEG testing referred by a healthcare provider to whom Alliance, Sleep Source, and/or RSS paid a kickback, is false under the FCA and/or the analogous state false claims laws.

12. Defendants' scheme corrupts the decision-making process of physicians, nurse practitioners, and physician assistants. Patients rely on such healthcare providers to engage in an objective inquiry into whether to order diagnostic testing as well as the nature of such testing (when, how, and for how long it occurs). Unbeknownst to the public at large and the patients at issue, Defendants' kickback arrangement interferes with this otherwise objective medical decision-making process by providing financial incentives to healthcare providers for ordering EEG and sleep study tests from Alliance, Sleep Source, and/or RSS. Not only are the healthcare providers rewarded on a per-test basis, they are rewarded additional compensation based on the *length* of the test.

13. Qui Tam Relators Bhuvana Mandalapu, M.D., and Ramakrishna Chava, M.D., (hereinafter Dr. Mandalapu and Dr. Chava, and collectively "Relators"), through their legal counsel Pietragallo Gordon Alfano Bosick & Raspanti, LLP and Kreindler and Associates, P.C. bring this

action ("the Complaint") on their own behalf, and on behalf of the United States of America and the sovereign States of Texas, New Jersey, California, Florida, Indiana, North Carolina, Georgia, Nevada, Louisiana, Maryland, Oklahoma, Tennessee, Virginia, Colorado, Illinois, Massachusetts, Michigan, Minnesota, New Mexico, Rhode Island, and Washington, as well as the District of Columbia, against Defendants. Dr. Mandalapu is a neurologist who was hired, on an independent contractor basis, to interpret EEG results for Alliance, Sleep Source, and/or RSS. Dr. Chava is a general practitioner who received Defendants' kickback-oriented sales pitch on multiple occasions, but rejected those offers.

## II.    JURISDICTION AND VENUE

14.    This action arises under the laws of the United States of America to redress violations of the federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, and the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

15.    Subject-matter jurisdiction is conferred by 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1331, 1345.

16.    The Court has jurisdiction over Defendants' violations of the False Claims Acts and Anti-Kickback Statutes of the plaintiff States of Texas, New Jersey, California, Florida, Indiana, North Carolina, Georgia, Nevada, Louisiana, Maryland, Oklahoma, Tennessee, Virginia, Colorado, Illinois, Massachusetts, Michigan, Minnesota, New Mexico, Rhode Island, and Washington, as well as the District of Columbia pursuant to 31 U.S.C. § 3732(b), because Defendants' violations of these laws and their violations of the federal FCA arise from the same transactions or occurrences.

17.    Moreover, the Court has supplemental jurisdiction over Defendants' state law and D.C. law violations and causes of action pursuant to 28 U.S.C. § 1367(a) because these state and D.C. law violations and claims and Defendant's violations of the federal FCA arise out of a common nucleus of operative facts.

18. The Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, and because the Defendants have at least minimum contacts with the United States, and can be found in, transact or have transacted, business in the Southern District of Texas.

19. Alliance, Sleep Source, and RSS regularly offer and perform healthcare services and submit or cause the submission of thousands of claims for payment to federal and state healthcare programs, including, but not limited to, Medicare, Medicaid, TRICARE, and the Federal Employee Health Benefits Plan ("FEHBP"). Magnuson, who resides in Dallas, Texas, was personally involved in orchestrating the nationwide payment of illegal kickbacks by Alliance, Sleep Source, and RSS. Ancor, a Southlake, Texas-based entity, meanwhile knowingly bankrolled and furthered the nationwide fraud at issue. Accordingly, all Defendants are subject to the jurisdiction of this Court.

20. Venue lies under 28 U.S.C. § 1391(b),(c) and 31 U.S.C. § 3732(a) because the Southern District of Texas is a district in which the Defendants can be found or transact business and an act proscribed by 31 U.S.C. § 3729 occurred within this district.

21. The specific facts, circumstances, and allegations of the Defendants' violations of the federal and state False Claims Acts have not been publicly disclosed in a civil suit, criminal suit, or administrative civil money penalty proceedings in which the government is already a party.

## III. PROCEDURAL HISTORY

22. Relators Dr. Mandalapu and Dr. Chava are the original source of all the information upon which this Complaint is based, as that phrase is used in the federal and state FCAs. There has been no public disclosure of the allegations herein.

23. To the extent any such disclosure has been made, such disclosure is unknown to Relators and Relators remain "original sources" under 31 U.S.C. § 3730(e)(4).

24. Relators have direct and independent knowledge of the information on which the allegations herein are based and voluntarily provided this information to the federal government and all relevant state governments prior to filing this action. See 31 U.S.C § 330(e)(4).

## IV. THE PARTIES

### A. Relators Mandalapu and Chava

25. Plaintiff/Relator Bhuvana Mandalapu, M.D., a board certified neurologist, epileptologist, and sleep medicine physician, is a resident of the state of Texas, and a naturalized citizen of the United States. He graduated from Siddhartha Medical College in 1990 and has been practicing medicine ever since. He is in private medical practice in Austin, Texas. His office is located at 8700 Manchaca Road, No. 205, Austin, TX 78748.

26. Plaintiff/Relator Ramakrishna Chava, M.D., a board certified family practitioner, is a resident of the state of Texas and a naturalized citizen of the United States. He graduated from Guntur Medical College in 1992 and has been practicing medicine ever since. He is in private medical practice in Kingwood, Texas. His office is located at Kingwood Medical Center, 22999 US Highway 59 North, No. 282, Kingwood, TX 77339.

### B. Defendant Alliance

27. Defendant Alliance of Family of Companies, LLC is a limited liability company headquartered at 4545 Fuller Drive, Suite 100, Irving, Texas 75038. Alliance Family of Companies was originally a corporation, having converted to a limited liability company in June 2017.

28. Alliance is a privately held corporation incorporated under the laws of Texas. It was formally incorporated in July 2015. Its current operations were previously performed primarily through RSS and Sleep Source prior to that date.

29. Alliance, by itself and/or through various subsidiaries, offers medical diagnostic services and operates a number of medical diagnostic facilities. Alliance provides its services in over 35 states. These states include, but are not limited to, Alabama, California, Colorado, Florida, Georgia, Indiana, Illinois, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, Missouri, North Carolina, Ohio, Oklahoma, Pennsylvania, Rhode Island, Tennessee, Texas, Utah, Virginia, and Washington. Alliance also operates in Washington, D.C.

30. Among the services Alliance offers are various forms of neurodiagnostic testing, including ambulatory EEG testing. Alliance is the largest provider of in-home video monitored EEG testing in the nation. Alliance also provides sleep diagnostic services.

31. Alliance reported 2015 revenue of $28.1 million. Alliance reported 2016 revenue of approximately $53.5 million.

32. Magnuson is the CEO of Alliance. He is the CEO or otherwise leads and manages each of Alliance's subsidiary and related components, including Sleep Source, LLC and Respiratory Sleep Solutions, Inc.

### C. Defendant Sleep Source

33. Defendant Sleep Source, LLC, is a limited-liability company headquartered at 4545 Fuller Drive, Suite 100, Irving, Texas 75038.

34. Sleep Source is a wholly-owned subsidiary of Alliance.

35. Sleep Source sometimes does business under the name PC Processing Services ("PPS").

36. Sleep Source is a provider of diagnostic services including EEG and sleep testing services. Services provided by Sleep Source include supplying equipment, personnel, supplies, and management necessary for such testing.

37. In or around 2010, Sleep Source was founded by Magnuson, Jose Mendez, and Brian Puente, all of whom worked together at their former employer, Pacific Pulmonary Services (a sleep diagnostics company). Magnuson soon bought out Mendez and Puente and, in or around 2011, Magnuson merged Sleep Source with Defendant Respiratory Sleep Solutions, Inc.

38. Following the merger, Sleep Source and Respiratory Sleep Solutions continued to exist, although for all practical purposes, these companies all do business as the Alliance Family of Companies, LLC.

39. Sleep Source, LLC exists, at least in part, to further Defendants' kickback scheme as the illicit kickback contracts that Alliance enters into with healthcare providers to provide illicit kickbacks are, at least nominally, with Sleep Source, LLC.

### D.    **Defendant RSS**

40. Defendant Respiratory Sleep Solutions, Inc., is a for-profit corporation headquartered at 4545 Fuller Drive, Suite 100, Irving, Texas 75038.

41. RSS was founded in 2006 and, as noted above, later merged with Sleep Source, ultimately becoming a subsidiary of the Alliance Family of Companies, LLC. The company originally focused only on sleep diagnostic services.

42. RSS formally adopted the name "Alliance Family of Companies" in June 2013.

43. RSS is a provider of diagnostic services including EEG testing services.

44. In 2014, RSS billed Medicare for more ambulatory EEG tests for monitoring and localizing seizure activity, using Current Procedural Terminology Code number 95951, than any other provider in the United States.

### E. Defendant Magnuson

45. Defendant Justin Magnuson currently resides at 2200 Victory Avenue, Apartment 2702, Dallas, Texas.

46. Since 2011, Magnuson has served as the President and Chief Executive Officer of Alliance, Sleep Source, and RSS. He manages and controls each one of Alliance's various other subsidiaries and related companies, of which there are dozens.

47. Magnuson's businesses almost exclusively, if not exclusively, focus on obtaining referrals for exceptionally expensive ambulatory EEG services as well as sleep studies.

48. On information and belief, Magnuson is cognizant of the requirements governing the provision of ambulatory EEG services, sleep studies, and related diagnostic services. He is a member of Accreditation Commission for Health Care and the American Board of Registration of Electroencephalographic and Evoked Potential Technologists.

49. His company, Alliance, also once operated a school to train sleep study technicians.

### F. Defendant Ancor

50. Ancor Holdings, L.P. is a private equity firm with a principal place of business at 2720 East State Highway 114, Southlake, Texas 76092. Ancor does business under the name "Ancor Capital Partners."

51. In 2017, Ancor (and/or an investment vehicle owned, controlled, and operated by Ancor), purchased the Alliance Family of Companies, LLC, Sleep Source, LLC, Respiratory Sleep Solutions, Inc., and their subsidiaries and related entities in a buyout transaction.

52. On information and belief, Ancor performed due diligence prior to, during, and after the buyout transaction, as is standard operating procedure in private equity transactions. Through due diligence, a firm seeking to acquire another company performs an extensive review of the target's business model, its financial statements and books of account, audit reports and correspondence, the company's internal control protocols, lists of customers and referral sources, complaints from physicians and other referral sources, all contracts the target has entered into within the last several years, the target's marketing and sales practices, policies, and correspondence, its legal liabilities, and other matters. An analysis of every aspect of the target's business is performed. No stone is left unturned as the lengthy and comprehensive due diligence process proceeds. Given that Alliance's business model is, as set out below, based *almost entirely* on providing kickbacks to referring healthcare providers, Ancor, by virtue of its due diligence efforts, had knowledge of the stark and systemic compliance problems set out in this Complaint, namely that Alliance, RSS, Sleep Source, and Magnuson entered into contracts to provide, and did provide, illicit remuneration to healthcare providers for referrals of diagnostic tests to Alliance.

53. The fact that Alliance was paying massive sums of money to primary care providers and other non-neurologists for ordering highly specialized, highly expensive tests which are otherwise almost exclusively ordered by neurologists would alone raise an unmistakable red flag to any potential acquirer.

54. Ancor would thus be well aware of what provided and provides Alliance a competitive edge — its payment of kickbacks to referring providers.

55. On information and belief, Ancor was also aware of the practice of Alliance and its subsidiaries of upcoding services by virtue of its due diligence before and after consummation of the buyout transaction. Specifically, Ancor was aware that Alliance, RSS, and Sleep Source billed insurers for services under Current Procedural Terminology Code 95957 for each ambulatory EEG despite not performing the services associated with that code.

56. On information and belief, by virtue of Ancor's due diligence, Ancor was also aware that Alliance had placed Medical Assistants at referring practices in order to perform Medicare Annual Wellness Visits and to induce and facilitate the referral of tests to Alliance for Medicare patients. The fact that a diagnostics company was placing Medical Assistants in referring practices to perform services for Medicare patients, a highly unusual arrangement, alone would ring a resounding alarm bell in any company performing due diligence.

57. Moreover, the management of Alliance had minimal background in the medical field and little to no experience in the EEG field. Those factors would only amplify the unavoidable compliance concerns that would arise during due diligence.

58. In fact, Ancor specializes in acquiring healthcare companies (which comprise approximately half of Ancor's investment portfolio) and even owns and controls a medical billing and coding company. Ancor touts its "extensive experience" in the healthcare industry.

59. Notwithstanding Alliance's manifest compliance failures, Ancor nevertheless purchased Alliance, provided the company substantial financial support in the process, and has knowingly and intentionally sought to expand Alliance's business without taking steps to terminate the illegal activity that forms the bedrock of Alliance's business. Ancor has intentionally aided and bankrolled Alliance's illicit business and the expansion of that business and sought to profit off of Alliance's illegal enterprise.

60. In fact, Ancor, like most private equity firms, advertises its services as focused on "operational" investing where the firm is not a passive investor, but an active manager of each business they acquire.

61. Despite the buyout, full control over Alliance, and the illegal practices at hand, Ancor has not only failed to change Alliance's illegal practices, Ancor has failed to replace any of Alliance's management. Since the buyout transaction closed, management has remained the same as it was prior to the deal: Mr. Magnuson remains the Chief Executive Officer, Conor M. Butts remains the Chief Operating Officer, Mitchell Don Jacobs remains the Chief Development Officer, Zach Williams remains the Vice President of Sales, Steven Lambert remains the Controller, and Pamela Wagner remains General Counsel.

## V. BACKGROUND ON FEDERAL & STATE-FUNDED HEALTH INSURANCE PROGRAMS

### A. Medicare Program

#### 1. Medicare Covers Only Medically Necessary Services

62. In 1965, Congress enacted Title XVIII of the Social Security Act, which established the Medicare Program to provide health insurance for the elderly and disabled. Medicare is a health insurance program for: people age 65 or older; people under age 65 with certain disabilities; and people of all ages with end-stage renal disease (permanent kidney failure requiring dialysis or a kidney transplant). Medicare now has four parts: Part A (inpatient hospital treatment); Part B, Part C (managed care plans), and the Part D (prescription drug) Program.

63. Medicare Parts A and B are often referred to, collectively, as "Original Medicare".

64. Medicare Part B (Medical Insurance) helps cover doctors' services and outpatient care, including EEG testing. Part B helps pay for covered health services and supplies when they are medically necessary.

65. Medicare Part C (Medicare Advantage) provides Medicare Part B recipients with additional, private healthcare plans that provide coverage consummate with that provided in Original Medicare and may provide additional coverage as well.

66. Over the last forty years, the Medicare Program has enabled the elderly and disabled to obtain necessary medical services from medical providers throughout the United States.

67. The Medicare Program is administered through the United States Department of Health and Human Services ("HHS") and, specifically, the Centers for Medicare and Medicaid Services ("CMS"), an agency of HHS. Much of the daily administration and operation of the Medicare Program is managed through private insurers under contract with the federal government (particularly CMS).

68. To participate in Medicare, providers must assure that their services are provided economically and only when, and to the extent they are, medically necessary. Sections 1814(a)(2) and 1835(a)(2) of the Social Security Act, establish that, as a condition for Medicare payment, a physician must certify the necessity of the services and, in some instances, recertify the continued need for those services. 42 C.F.R. § 424.10. Regardless of the rules governing the particular type of care, in order for the federal government to cover services under Medicare Part A or Medicare Part B, or for a Medicare Part C plan to provide coverage, all care must be "medically necessary."

69. Medical care is "medically necessary" when it is ordered or prescribed by a licensed physician or other authorized medical provider, and Medicare (or a Medicare Part C plan) agrees that the care is necessary and proper. Services or supplies that are needed for the diagnosis or treatment of a medical condition must meet the standards of good medical practice in the local area.

70. Medicare, including, but not limited to, Medicare Part C plans, provides reimbursement to healthcare providers for administering and interpreting EEG tests.

**B.    The Medicaid Program**

71.    Medicaid was created in 1965, at the same time as Medicare, when Title XIX was added to the Social Security Act. The Medicaid program aids the states in furnishing medical assistance to eligible needy persons, including indigent and disabled people. Medicaid is the largest source of funding for medical and health-related services for America's poorest people. Medicaid is a cooperative federal-state public assistance program which is administered by the states.

72.    Funding for Medicaid is shared between the federal government and those state governments that choose to participate in the program. Federal support for Medicaid is significant. For example, in fiscal year 2017, in the state of New Jersey, the federal government provides 50% of the funding for Medicaid, while the state pays 50% of the funding. The federal government also provides greater than 50% of the funding for Medicaid programs in Florida, Georgia, Oklahoma, Tennessee, and Texas. The remaining funds are provided by the state. Title XIX of the Social Security Act allows considerable flexibility within the States' Medicaid plans and, therefore, specific Medicaid coverage and eligibility guidelines vary from state to state.

73.    Medicaid reimburses healthcare providers for EEG services.

74.    Like the Medicare Program, Medicaid only covers services or supplies that are medically necessary for the diagnosis or treatment of a medical condition, in keeping with the standards of good medical practice in the local area.

**C.    Other Federal Healthcare Programs**

75.    In addition to Medicaid and Medicare, the federal government reimburses a portion of the cost of diagnostic services (including EEG testing and the interpretation of those results) under several other federal healthcare programs, including but not limited to CHAMPUS/TRICARE, CHAMPVA, and the Federal Employees Health Benefit Program ("FEHBP").

14

76. CHAMPUS/TRICARE, administered by the United States Department of Defense, is a healthcare program for individuals and dependents affiliated with the armed forces. CHAMPVA, administered by the United States Department of Veteran Affairs, is a healthcare program for the families of veterans with a 100 percent service-connected disability. The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for hundreds of thousands of federal employees, retirees, and their survivors.

## VI. APPLICABLE LAW

### A. The Federal False Claims Act

77. The federal False Claim Act ("federal FCA") provides, in pertinent part:

(a) Any person who (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (3) conspires to commit a violation of (1) or (2) is liable to the United States Government for a statutory civil penalty, plus three times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. § 3729(a)(1)(A)-(C).

(b) "[T]he terms 'knowing" and "knowingly' (A) mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information; and require[s] no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1).

### B. The Federal Anti-Kickback Statute

78. Enacted in 1972, the main purpose of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), is to protect patients and federal healthcare programs from fraud and

abuse by curtailing the corrupting influence of money on healthcare decisions.

79.     When an entity pays kickbacks to a provider in order to induce him/her to refer or recommend patients to the entity for goods and/or services, it fundamentally compromises the integrity of the doctor-patient relationship. Government-funded healthcare programs, such as Medicare and Medicaid, rely upon providers to decide what treatment is appropriate and medically necessary for patients, and, therefore, payable by that healthcare program. As a condition of its reimbursement, government healthcare programs require that the physicians must render their services without the conflict inherent in receipt of a kickback.

80.     The federal Anti-Kickback Statute and analogous state laws make it a crime to knowingly and willfully offer, pay, solicit or receive any remuneration to induce a person:

(1)     to refer an individual to a person for the furnishing of any item or service covered under a federal healthcare program; or

(2)     to purchase, lease, order, arrange for or recommend any good, facility, service, or item covered under a federal healthcare program.

42 U.S.C. § 1320a-7b(b)(1) and (2).

81.     The term "any remuneration" encompasses any kickback, bribe, or rebate, direct or indirect, overt or covert, in cash or in kind. 42 U.S.C. § 1320a-7b(b)(1).

82.     Violations of the federal Anti-Kickback Statute must be knowing and willful. 42 U.S.C. § 1320a-7b(b)(1).

83.     The federal Anti-Kickback Statute has been interpreted by the federal courts to cover any arrangement involving federal healthcare program funds where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals. Proof of an explicit *quid pro quo* is not required to show a violation of the Anti-Kickback Statute.

84.     A violation of the federal Anti-Kickback Statute constitutes a felony punishable

16

by a maximum fine of $25,000, imprisonment up to five years, or both. Any party convicted under the federal Anti-Kickback Statute *must* be excluded (*i.e.*, not allowed to bill for any services rendered) from Federal healthcare programs for a term of at least five years. 42 U.S.C. § 1320a-7(a)(1).

85.     Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the federal Anti-Kickback Statute, the Secretary may exclude that provider from federal healthcare programs for a discretionary period, and may impose administrative sanctions of $50,000 per kickback violation. 42 U.S.C. § 1320a-7(b).

86.     HHS has published safe harbor regulations that define practices that are not subject to prosecution or sanctions under the federal Anti-Kickback Statute because such practices would unlikely result in fraud or abuse. See 42 C.F.R. § 1001.952. However, only those arrangements that precisely meet all of the conditions set forth in the safe harbor are afforded safe harbor protection.

87.     Compliance with the Anti-Kickback Statute is a condition of payment under the Medicare and Medicaid programs, and that condition applies regardless of which entity is submitting the claim to the government.

88.     The Anti-Kickback Statute expressly provides that claims that arise from a kickback scheme are false and violate the False Claims Act. No further express or implied false statement is required to render such infected claims false, and none can wash the claim clean.

89.     It is the very fact that the healthcare decision-maker has accepted a kickback that *per se* renders not payable the claims for goods or services as to which the kickback was given, not whether the decision-maker would have otherwise selected that good or service.

90.     Moreover, as a prerequisite to participating in federally-funded healthcare providers, like Alliance, RSS, and Sleep Source, must certify (expressly or, through their

17

participation in a federally-funded healthcare program, impliedly) their compliance with the federal Anti-Kickback Statute.

91.     As a prerequisite to participating in the various state Medicaid programs, providers of healthcare services must certify (expressly or, through their participation in the state-funded healthcare program, impliedly) their understanding of and compliance with both the federal Anti-Kickback Statute and applicable state anti-kickback laws.  Compliance with the Anti-Kickback Statute is a precondition for payment

92.     Even in absence of an express certification of compliance, a party that submits a claim for payment impliedly certifies compliance with all conditions of payment, *i.e.,* that it is properly payable. Consequently, if a healthcare provider pays a kickback to induce the referral or recommendation of a patient for inpatient or out-patient services and related goods, it renders false the submitter's implied or express certification of compliance that the resulting claim meets the requirements of the Anti-Kickback Statute.

93.     Many states, including those states identified as Plaintiffs herein, have enacted similar prohibitions against the provision of illegal inducements to healthcare decision-makers.

## VI.     DEFENDANTS PAID ILLEGAL KICKBACKS TO PHYSICIANS ACROSS THE UNITED STATES TO INDUCE THEM TO ORDER COSTLY AMBULATORY EEG TESTS

### A.     The Ambulatory EEG Tests at Issue

94.     Alliance, RSS, and Sleep Source offer both video and non-video ambulatory EEG monitoring services.  However, Alliance, RSS, and Sleep Source primarily market and provide video ambulatory EEG monitoring services.

95.     An ambulatory EEG is an exceptional procedure, being indicated and medically necessary in rare cases.

96. Ambulatory EEG monitoring is a diagnostic procedure for patients in whom a seizure diathesis is suspected but not defined by history, physical, or a routine EEG (also called a "resting" EEG).

97. An ambulatory EEG consists of a recording of the patient's brain waves, typically over a period of twenty-four hours or more. The testing may occur at a patient's home.

98. During an ambulatory EEG, at least four electrodes (also called "recording channels") are placed on the patient. Those electrodes transmit information to a portable recording device, typically attached to the patient's waist or on a shoulder harness. At the same time, a video recording is made of the patient throughout the testing procedure.

99. CMS's National Carrier Determination 160.22, issued in 1984, sets out the standard for when Medicare will pay for ambulatory EEG services. In that Determination, CMS states that:

> Ambulatory EEG monitoring is a diagnostic procedure for patients in whom a seizure diathesis is suspected **but not defined by** history, physical or **resting EEG.** Ambulatory EEG can be utilized in the differential diagnosis of syncope and transient ischemic attacks if not elucidated by conventional studies. **Ambulatory EEG should always be preceded by a resting EEG.**

NCD 160.22 (emphasis added) (effective date: June 12, 1984). Various Local Carrier Determinations that apply to Alliance and/or its myriad subsidiaries provide similar mandates.

100. The National Institute for Health and Clinical Excellence has set out guidelines concerning the treatment of epilepsy which state that "[l]ong-term video or ambulatory EEG may be used in the assessment of children, young people and adults who present diagnostic difficulties after clinical assessment and standard EEG." (effective 2004).

101. Medicare anticipates that many outpatient ambulatory EEGs will not provide the diagnosis within the first 24 hours, but expects that 72 hours of monitoring will be diagnostic in most cases.

102. While primary care physicians are not prohibited from ordering ambulatory EEG testing, it is by and large the case that patients only receive this specialized testing after consulting with a neurologist, who decides whether or not to order such testing. In fact, it is rare that a primary care physician would ever order a *routine* EEG let alone a highly expensive and lengthy ambulatory EEG.

103. The same is true of the other non-neurologist healthcare providers that Alliance focuses on in illicitly marketing its neurodiagnostic and sleep study offerings. Namely, Alliance sales representatives also seek to obtain referrals for those specialized in various other fields, from cardiologists to psychiatrists.

104. Ambulatory EEG testing is identified using the American Medical Association's Current Procedural Terminology ("CPT") codes 95950-95953 and 95956.

105. Routine or Resting EEG testing is identified using CPT Codes 95812, 95813, 95816, 95819, 95822, or 95827.

106. Also relevant to this Complaint is CPT Code 95957, which is the code for Digital Analysis of EEGs.

107. CPT Code 95957 requires that the interpreting neurologist and technician administering the EEG conduct a digital analysis of the EEG test results using quantitative analytical techniques such as data selection, quantitative software processing, and dipole source analysis.

108. Numerous Medicare Local Carrier Determinations (L34521, L33699) have made clear that: "Code 95957 is reported when substantial additional digital analysis was medically necessary and was performed, such as 3D dipole localization."

109. Various groups, including the American Medical Association ("AMA"), the American Academy of Neurology ("AAN"), and the American Clinical Neurophysiology Society (the "ACNS") recognize that Code 95957 is exceptional and should not generally be employed.

110. The AMA, which creates and manages the CPT standard, has made clear that CPT Code 95957 "should not be used for digital EEG recording, spike detection, or seizure detection" and, relatedly, that "[i]t is not appropriate to report code 95957 for source localization when there are no spikes to analyze (e.g., when the video-EEG monitoring is normal)." American Medical Association, CPT Assistant, Nov. 2010:6. The AMA has further noted that "[m]any patients receive video-EEG monitoring for other reasons such as differential diagnosis, and in those cases, code 95957 is not likely to be medical necessary."

111. The AAN and ACNS have stated that:

> **Code 95957 should not be used simply when the EEG was recorded digitally. There is no additional charge for turning on an automated spike and seizure detector on a routine EEG, ambulatory EEG, or video-EEG monitoring.** Nor is there an additional code for performing EEG on a digital machine instead of an older generation analog machine. Some features of digital EEG make it easier and quicker to read, and other features slow it down by providing new optional tricks and tools. Overall, it is about the same amount of work as an analog EEG.
>
> **Code 95957 is used when substantial additional digital analysis was medically necessary and was performed, such as 3D dipole localization. In general, this would entail an extra hour's work by the technician to process the data from the digital EEG, and an extra 20-30 minutes of physician time to review the technician's work and review the data produced. Most practitioners would not have the opportunity to do this**

> **advanced procedure.** It would be more commonly used at specialty centers, e.g. epilepsy surgery programs. Note that the codes for "monitoring for identification and lateralization of cerebral seizure focus" already include epileptic spike analysis.

See ACNS Coding FAQ (emphasis added)[1]; American Academy of Neurology Guidance/FAQ.[2]

**B.** **Defendants' Scheme of Paying Kickbacks to Induce the Ordering of Ambulatory EEGs**

112. Alliance, Sleep Source, and RSS employ an extensive sales force to aggressively market their ambulatory EEG services to primary care physicians, neurologists, nurses, physician assistants, as well as other non-neurologist healthcare providers (the "ordering healthcare providers").

113. As part of that sales pitch, Alliance, Sleep Source, and/or RSS offer healthcare providers hundreds of dollars (and in some cases well over $1,000) for each patient that they refer to them for an ambulatory EEG test.

114. In particular, Defendants offer referring physicians sham agreements, known as an "Agreement to Interpret Electroencephalograms" (hereafter "EEG Interpretation Agreements").

115. In those EEG Interpretation Agreements, Defendants agree to pay the referring healthcare provider (labeled, fraudulently, the "Interpreting Physician") hundreds of dollars (or more) per ambulatory EEG test to provide their so-called "expert interpretation" of those tests.

116. In reality, however, the Interpreting Physician does not provide any expert interpretation of the ambulatory EEG tests performed by Alliance, Sleep Source, and/or RSS.

---

[1] *Available at* https://www.supercoder.com/webroot/upload/general_pages_docs/document /3681.pdf (quoting ACNS's Coding FAQ) (emphasis added)

[2] *Available at* https://www.aan.com/Guidelines/Home/GetGuidelineContent/336.

117. Instead, Defendants contract separately with a neurologist who provides an expert interpretation of the ambulatory EEG test, along with a written report of their findings. Alliance refers to this as the "Neurologist Technical Report." Notably, when Dr. Mandalapu referred patients to Alliance (and interpreted those patients' test results), Alliance *never* provided him a "Neurologist Technical Report," confirming that the "Neurologist Technical Report" is merely a relabeled neurologist interpretation which Alliance provides to healthcare providers who wish to receive remuneration from Alliance without actually performing an interpretation.

118. When the EEG test is ready for the neurologist (i.e., the non-referring physician) to review, Alliance sends an email to the neurologist noting that the "patient is available in Centrum [the name of the computer software that allows neurologists to view the EEG test results] for *interpretation*, please review and report within 48 hours." (emphasis added).

119. The neurologist then logs into Centrum and views the EEG test results, which includes: (a) the recording of the patient's brain waves during the test period; (b) the video recording of the patient during the test period, and (c) an Ambulatory EEG report containing the patient's information, the technician's summary, and a blank space for the neurologist to type in their Neurologist Technical Report.

120. Moreover, Alliance's sales brochure, which Alliance's Medical Sales Representative Dan Philbrick ("Philbrick") provided to Dr. Mandalapu, states that a "[c]ompleted [EEG] study will be accessible to the interpreting physician within 24 hours via [Centrum]. (If the referring physician does not interpret the study, one of Alliance's Board Certified Neurologists will complete the interpretation) . . . Upon completion of the interpretation the study will be returned to the referring physician within 1 to 2 business days." Accordingly, Alliance's own brochure recognized that a non-referring neurologist actually performs the interpretations.

23

121. Further, Alliance's website previously touted as a benefit to referring doctors that "[i]f the referring physician does not interpret the study, one of Alliance's Board Certified Neurologists will complete the interpretation[.] Upon completion of the study the interpretation will be returned to the referring physician within 3 to 5 business days." Alliance later deleted that language from its website.

122. Alliance subsidiary Telemedx Corporation has similarly made clear on its website that it provides a *neurologist's interpretation* to referring physicians, stating that "[a]ll EEG, NCV [nerve conduction velocity study], [and] LTM [long term monitoring] studies are *interpreted by a Board Certified Neurologist.*" (emphasis added).

123. Coastal Diagnostics, LLC, another Alliance subsidiary, noted on its website (which is now inactive) that they "provide physicians with . . . *interpreted reports.*"

124. Accordingly, Alliance and its subsidiaries have made clear that they are in the business of providing interpretations to referring providers and that neurologists indeed perform such interpretations. After the neurologist adds their Neurologist Technical Report, Defendants provide a copy of the completed Ambulatory EEG Test Report to the so-called Interpreting (i.e. referring) Physician, who merely signs their name and date at the very bottom of that report.

125. In many instances the so-called Interpreting Physicians are primary care physicians or other non-neurologists lacking the specialized medical training and qualifications to provide an "expert interpretation" of the ambulatory EEGs (or make sense of the EEG data *at all*) performed by Alliance, Sleep Source, and/or RSS. In some cases the "interpreting physician" is not even a physician at all, he or she is a nurse, or similar non-physician, keen on taking advantage of Alliance's kickback. When Dr. Chava was offered the kickback, Alliance made no inquiry into whether Dr. Chava was, in fact, capable of providing any such interpretive

services or had *any* background or experience in the complex science of electroneurodiagnostic medicine.

126. Although the EEG Interpretation Agreement does not specify that the so-called Interpreting Physician will be interpreting the ambulatory EEG tests performed on their *own patients*, Defendants only paid non-neurologist providers for referring their own patients to Defendants. That is, despite being labeled "Interpreting Physicians," Alliance never requested that they perform any interpretation services for other physicians.

127. Through these sham EEG Interpretation Agreements, Defendants paid referring physicians, nurses, physician assistants, and facilities hundreds to thousands of dollars for each patient they referred to Alliance, Sleep Source, and/or RSS for an ambulatory EEG.

128. Relators Chava and Mandalapu have direct and independent information regarding Defendants' kickback scheme.

### (1) Defendants Offered Kickbacks to Relator Chava

129. Dr. Chava was approached by Alliance sales representative Brian Bartholomew ("Bartholomew") in or about June of 2016, and approximately four to five times thereafter. During those meetings, Bartholomew aggressively marketed the kickback scheme at issue, attempting to convince Dr. Chava to participate in the kickback arrangement.

130. On those occasions, Bartholomew offered Dr. Chava the aforementioned inducements, indicating that he would be paid for referring his patients to Alliance and that the compensation would be based on the volume of patients that he referred as well as the lengths of the referred tests.

131. Dr. Chava was asked by Bartholomew to sign an EEG Interpretation Agreement. A copy of the EEG Interpretation Agreement presented to Dr. Chava is attached as Exhibit A.

132. The EEG Interpretation Agreement that Bartholomew presented to Dr. Chava was between Dr. Chava and Sleep Source d/b/a "PC Processing Services.". Defendant Magnuson was the signatory for Sleep Source on the EEG Interpretation Agreement presented to Dr. Chava.

133. Bartholomew explained to Dr. Chava that the payment he received would be based on the number of referrals and the length of the test ordered from Defendants. Defendants offered Dr. Chava $300 per 24-hour period of video monitored ambulatory EEG testing. Thus, a physician referring a patient for three days of EEG testing would be paid $900. Similarly, Defendants would pay a physician $1,500 for the referral of a patient for five days of EEG testing.

134. Consistent with Bartholomew's explanation, the EEG Interpretation Agreement presented to Dr. Chava provides that: "Interpreting Physician shall receive an Interpreting Physician's fee for Video Monitored Ambulatory EEG (95951-26) [95951-26 being the professional component, i.e. the interpretation, of the VAEEG] as follows: $300.00 per 24-hour period."

135. Additionally, the EEG Interpretation Agreement presented to Dr. Chava provides that:

- "Interpreting Physician shall receive an Interpreting Physician's fee for Monitored Ambulatory EEG (95953-26) as follows: $125.00 per 24-hour period."

- "Interpreting Physician shall be reimbursed for reasonable expenses actually incurred by Interpreting Physician in attending functions on behalf of the PPS."

- "Payment will be made by PPS to the Interpreting Physician within forty-five (45) days from the last day of the month that the service was provided."

- "The parties hereto agree that Physician shall not receive more than $26,250 in the aggregate on a monthly basis or $315,000 on an annual basis for the performance of the duties set forth herein."

136. In addition to the EEG Interpretation Agreement, Bartholomew provided Dr. Chava with a handout providing "a partial list of the indications which meet the medical necessity for [Defendants' ambulatory video EEG testing]: Stroke/TIA; Dementia; Syncope; Intermittent Word Finding Difficulties; Unusual Spells or Episodes; Intermittent Confusion; Head Trauma / Post-Concussion Syndrome; TBI; Altered Consciousness; and Seizures" (hereinafter the "Medical Necessity Handout").

137. Bartholomew explained to Dr. Chava that — consistent with Alliance's sales pitch that ordering tests from Alliance could be a lucrative opportunity — there were numerous medical indications which a physician could use to try to justify to insurers the referrals to Alliance for ambulatory EEG testing.

138. Alliance's sales pitch exploits both the substantial compensation that an ordering provider could receive on a per-test basis, as well as the relative ease by which the providers could document a potential medical justification for the ambulatory EEG tests. Accordingly, healthcare providers were not just presented the opportunity to avail themselves of kickbacks, but to do so frequently and easily.

139. In fact, the Medical Necessity Handout that Bartholomew provided to Dr. Chava advertising Alliance's services describes Medicare reimbursement of "$900 per 72 hour study" as "[a]ncillary [i]ncome" and an "[a]dded [b]enefit[]" of Alliance's services.

140. Another "[a]dded [b]enefit[]" according to Defendants' handout was that Alliance provided administrative services, including:

- Alliance's "staff conducts the verification of benefits and pre-certification, and coordinates scheduling of the test directly with the patient" and

- the "[d]octor bills office visit to review test results with the patients (Physicians [sic] Discretion)."

141. Dr. Chava refused to enter into the EEG Interpretation Agreement, expressing his concern to Bartholomew that the arrangement was an illegal kickback. Nevertheless, Bartholomew continued to try to convince Dr. Chava to join in on the arrangement. Bartholomew indicated that many non-neurologist physicians were engaged in the kickback arrangement with Alliance and provided Dr. Chava the names of certain of these physicians. Specifically, Bartholomew told Dr. Chava of two local primary care physicians and a local cardiologist who were engaged in the referral arrangement with Alliance. Bartholomew also noted that, even if Dr. Chava was uncomfortable with receiving *direct* payment from Alliance, he also had the option to bill the interpreting neurologist's professional component himself, which would allow him to receive the identical $900 referral fee, albeit from the insurer. Dr. Chava refused to engage in the kickback arrangement.

142. In addition to the EEG Interpretation Agreement, Bartholomew provided Dr. Chava with a Sleep Study Interpretation Agreement. *See* Exhibit C.

143. Similar to the EEG Interpretation Agreement, the Sleep Study Interpretation Agreement offered physicians compensation for sham "expert interpretation" services of sleep studies, including: "home sleep studies; continuous positive airway pressure testing; and polysonagram [sic] testing." The third listed service is a misspelling of "polysomnogram."

144. In particular, the Sleep Study Interpretation Agreement presented to Dr. Chava provides that:

- "Interpreting Physician shall receive an Interpreting Physician's fee as follows: $125 per study (95810-26 and 95811-26)."

- "Interpreting Physician shall receive an Interpreting Physician's fee as follows: $50 per study (95800-26 and 95806-26)."

- "Payment will be made by PPS to the Interpreting Physician within forty-five (45) days from the last day of the month that the service was provided."

- "The parties hereto agree that Physician shall not receive more than $2,916 in the aggregate on a monthly basis or $35,000 on an annual basis for the performance of the duties set forth herein."

145. While Alliance would pay the sums set out above to referring healthcare providers for so-called "interpretation" services, those services would be performed by other physicians, not the referring healthcare provider.

146. Alliance's website previously stated the sleep study will be "scored and reviewed by the reading physician, most likely a sleep specialist, if not performed by your own referring physician. Once the results have been reported, a copy of the report will be sent to your referring physician. Your referring physician's office or a representative from the sleep center will likely call you with the results and recommendations noted by the reading physician." That language has since been deleted from Alliance's website.

147. Moreover, Telemedx, one of Alliance's subsidiaries, notes on its website that it provides "[s]leep [s]tudy [i]nterps" to referring providers.

148. Dr. Chava refused to enter into the Sleep Study Interpretation Agreement, and he did not refer any patients to Defendants for sleep studies.

### (2) Relator Mandalapu Provided Expert Interpretation Services for Defendants

149. In or around September 2015, another Medical Sales Representative for Alliance, Dan Philbrick, visited the medical office of Dr. Mandalapu. During that visit, Philbrick left information at the front desk regarding the ambulatory EEG tests offered by Alliance. That information included a copy of the same marketing materials that Alliance provided to Dr. Chava, including the Medical Necessity Handout.

150. Philbrick continued to visit Dr. Mandalapu's offices after September 2015, to present his sales-pitch about the ambulatory EEG tests offered by Alliance.

151. Philbrick told Dr. Mandalapu that Alliance was interested in paying him, on an independent contractor basis, to interpret EEG tests for Alliance.

152. Philbrick told Dr. Mandalapu that Alliance would pay the following sums for interpreting EEGs:

- $160 per 24-hour period for interpreting a Video-Monitored Ambulatory EEG (CPT Code 95951)

- $57 per study for interpreting a Routine Ambulatory EEG (CPT Code 95816)

- $51 per study for interpreting a Digital Analysis of an Ambulatory EEG (CPT Code 95957).

153. In exchange for this payment, Dr. Mandalapu would be required to provide Alliance with a written report of his expert neurologist findings for each EEG test he interpreted, referred to by Alliance as the "Neurologist Technical Report."

154. In or around January 2016, Dr. Mandalapu began to interpret EEGs for Alliance and has, since then, interpreted between 150 and 200 tests for Alliance.

155. For each EEG study submitted to Dr. Mandalapu, he spent approximately one hour reviewing the data and providing his interpretation and report.

156. Dr. Mandalapu received a check via U.S. Mail each month for the interpretations that he performed for Alliance. The checks Defendants provided to Dr. Mandalapu for his interpretations, which were signed by Mr. Magnuson, referred to Dr. Mandalapu's interpretation services as "EEG NeuroReads" [sic]. A "read" of an EEG is synonymous with an "interpretation" (i.e. the professional component) of an EEG.

157. Included with each check was a spreadsheet showing each interpretation Dr. Manadalapu performed. For each such interpretation Alliance and/or Sleep Source provided the following information: (1) the Alliance Sales Representative; (2) the "Set-Up" Date; (3) the patient's name; (4) the patient's insurance company; (5) the name of the Neurologist who performed the interpretation; (6) the "Signature Date;" (7) the amount paid to the Neurologist; (8) the number of 24-hour units billed using CPT Code 95951; (8) whether a CPT Code "52 Modifier" was used; (9) the number of services billed using CPT Code 95953; (10) whether a "Routine" EEG had been performed; (11) whether Alliance submitted a bill for the "PC" or Professional Component of the Ambulatory EEG test; (12) whether Alliance submitted a bill for the "TC" or Technical Component of the Ambulatory EEG. Additionally, some of the spreadsheets that accompanied payments to Dr. Mandalapu included columns for "Ordering MD," "Notes," and "Exception." These spreadsheets are referred to herein as the "Interpretation Payment Spreadsheets."

158. The payments provided to Dr. Mandalapu for interpreting Alliance EEGs, made through Alliance subsidiary Sleep Source, included, but were not limited to:

| Date of Check | Check Number | Amount of Check |
|---|---|---|
| 2/17/2016 | 11955 | $428.00 |
| 3/17/2016 | 12243 | $5,292.00 |
| 5/17/2016 | 12644 | $4,116.00 |
| 6/17/2016 | 12926 | $18,116.00 |
| 7/18/2016 | 13183 | $17,312.00 |
| 8/19/2016 | 13584 | $11,487.00 |
| 11/18/2016 | 15583 | $13,572 |
| 12/16/2016 | 13957 | $5,772.00 |

159. Magnuson personally signed the December 16, 2016 check (number 13957) to Dr. Mandalapu on behalf of PC Processing Services.

160. Magnuson is also believed to have signed all the checks listed above in Paragraph 116, as well as all checks that Defendants sent to neurologists, like Dr. Mandalapu, for interpreting EEGs.

161. In a July 25, 2016 email to Dr. Mandalapu, Philbrick explained, that "[the] $588 [provided to Dr. Mandalapu for interpreting a three-day EEG ordered by a different healthcare provider] is an arrangement for you to be compensated for reading [the EEG study] for [the referring] PCP, [the PCP] still bill[s] the [professional component of the EEG] because they referred patients for the study."

162. Later, Philbrick told Dr. Mandalapu that he was also expected to refer his own patients to Alliance for ambulatory EEGs in order to be eligible to interpret EEGs for Alliance.

163. In a March 2017 email to Dr. Mandalapu, Philbrick noted that while the prior arrangement set out in the "Overread Agreement" (which governed Alliance's payments to Dr. Mandalapu for interpreting other healthcare providers' EEGs) was "more so an "Interp + Read" arrangement, Alliance was rolling out a new "Technical Summary Agreement" that classified Dr. Mandalapu's services, and those of other interpreting/non-referring neurologists, as a "Technical Summary." Dr. Mandalapu then asked Philbrick whether he was still required to perform a "real

interpretation." Philbrick responded Dr. Mandalapu "[y]es, absolutely'" Dr. Mandalpu had to perform the very same services as before of providing a real interpretation but now the "read [Dr. Mandalapu] provided [wa]s being classified as a technical summary."

164. When Dr. Mandalapu referred one of his patients to Alliance for an ambulatory EEG, Alliance billed the patient's insurance company (including government insurance programs like Medicare and Medicaid) for just the Technical Component of the Ambulatory EEG that was performed.

165. Alliance indicated that it was billing for just the Technical Component by attaching the "TC" modifier to the CPT Code for the Ambulatory EEG (for example, CPT Code "95951-TC.").

166. Thus, when Dr. Mandalapu referred one of his patients to Alliance for an ambulatory EEG, he did not receive payment from Alliance for interpreting that ambulatory EEG test.

167. Instead, Dr. Mandalapu directly billed the patient's insurance company (including government insurance programs like Medicare and Medicaid) for interpreting the ambulatory EEG just for the Professional Component of the ambulatory EEG that was performed.

168. Dr. Mandalapu indicated that he was billing for the interpretation of the EEG, otherwise known as the "Professional Component" of the EEG, by attaching the "26" modifier to the CPT Code for the ambulatory EEG (for example, CPT Code "95951-26.").

169. For example, in May and June of 2016, Dr. Mandalapu referred the following patients to Alliance for EEGs:

| Patient[3] | Insurance Company | Ordering Physician | Interpreting Physician | Amount Alliance Paid to Mandalapu |
|---|---|---|---|---|
| 1 | Texas Medicare | Mandalapu | Mandalapu | $0 |
| 2 | United Healthcare | Mandalapu | Mandalapu | $0 |
| 3 | Texas Medicare | Mandalapu | Mandalapu | $0 |
| 4 | Blue Cross | Mandalapu | Mandalapu | $0 |
| 5 | Texas Medicare | Mandalapu | Mandalapu | $0 |
| 6 | Texas Medicare | Mandalapu | Mandalapu | $0 |

170. When the patient was not one referred by Dr. Mandalapu, Alliance billed the patient's insurance company (including government insurance programs like Medicare and Medicaid) for both the Technical Component and Professional Component of the ambulatory EEG that was performed.

171. Billing for both the Technical Component and Professional Component of the ambulatory EEG is commonly referred to as "global billing."

172. Alliance indicated that it was global billing for an ambulatory EEG by billing for the applicable CPT Code without attaching either a "TC" or "26" modifier.

173. For example, the July 16, 2016 check that Dr. Mandalapu received from Alliance indicated that Alliance paid Dr. Mandalapu for interpreting EEGs for the following patients (none of whom were referred by Dr. Mandalapu):

| Patient | Insurance Company | Ordering Physician/Nurse | Interpreting Physician | Amount Alliance Paid to Mandalapu |
|---|---|---|---|---|
| 7 | Texas Medicare | R.B. | Mandalapu | $588 |
| 8 | Aetna | M.F. | Mandalapu | $588 |
| 9 | Texas Medicare | _.I. | Mandalapu | $588 |
| 10 | Aetna | _.I. | Mandalapu | $588 |
| 11 | Care Improvement Plus | H.L. | Mandalapu | $588 |
| 12 | Texas Medicare | H.L. | Mandalapu | $588 |
| 13 | Blue Cross/Blue Shield | K.L. | Mandalapu | $588 |
| 14 | Superior Health Plan | A.L. | Mandalapu | $588 |

---

[3] To protect the identity of the patients involved, the names and other personally identifying information have been removed from this Complaint. However, the spreadsheet that Dr. Mandalapu received from Alliance and/or Sleep Source included, among other information, the names of the patients listed in Paragraphs 165 and 169.

| Patient | Insurance Company | Ordering Physician/Nurse | Interpreting Physician | Amount Alliance Paid to Mandalapu |
|---|---|---|---|---|
| 15 | United Healthcare | R.B.M. | Mandalapu | $588 |
| 16 | Aetna | R.B.M. | Mandalapu | $588 |
| 17 | Blue Cross Blue Shield of Texas | R.B.M. | Mandalapu | $588 |
| 18 | Humana | R.B.M. | Mandalapu | $908 |
| 19 | Cigna | R.B.M. | Mandalapu | $908 |
| 20 | United Healthcare | R.B.M. | Mandalapu | $908 |
| 21 | United Healthcare | R.B.M. | Mandalapu | $908 |
| 22 | Texas Medicare | R.B.M. | Mandalapu | $908 |
| 23 | Blue Cross Blue Shield of Texas | R.B.M. | Mandalapu | $908 |
| 24 | Cigna | R.B.M. | Mandalapu | $908 |
| 25 | United Health Select | R.B.M. | Mandalapu | $908 |
| 26 | Tricare South (Humana) | R.B.M. | Mandalapu | $908 |
| 27 | United Healthcare | R.B.M. | Mandalapu | $908 |
| 28 | Humana | R.B.M. | Mandalapu | Paid August |
| 29 | Cigna | D.S. | Mandalapu | $588 |
| 30 | Texas Medicare | D.S. | Mandalapu | $588 |
| 31 | Blue Cross Blue Shield of Texas | D.S. | Mandalapu | $588 |

174. Only one of the referring providers identified above in Paragraph 169 (Dr. _.I) practices in neurology. The remaining referring providers include family physicians, a pediatrician, an internal medicine physician, and even a nurse practitioner.

175. Nonetheless, for each referring physician, nurse, physician assistant, or healthcare facility that entered into Defendants' sham EEG Interpretation Agreement, Defendants would have them sign a copy of Dr. Mandalapu's report as the "Interpreting Physician." Alliance would then pay those referring providers the per-patient, per-day kickback fee specified above in Paragraph 130.

176. Meanwhile, the neurologist that actually interpreted the test would have their interpretation labeled a "Neurologist Technical Report." The *referring* provider, who performed

no interpretation services, would then sign their name under the portion of the report titled "EEG Clinical Interpretation."

177. Despite the fact that Dr. Mandalapu began interpreting EEGs for Defendants in January 2016, Defendants did not provide him with a written agreement until around May 2016. In particular, in or around May 2016, Philbrick left for Dr. Mandalapu at his office a written agreement, entitled "Agreement to Overread Electroencephalograms" (hereinafter "Overrread Agreement"). A copy of the Overread Agreement presented to Dr. Mandalapu is attached as Exhibit B.

178. According to the Overread Agreement, Dr. Mandalapu would provide Sleep Source (d/b/a PPS) with "an expert overread of designated test results submitted by PPS or local scoring center within two (2) business days of receiving them or within such time period as is reasonably satisfactory to PPS." In exchange, Sleep Source agreed to pay Dr. Mandalapu the compensation set forth above in Paragraph 148.

179. Despite being labeled an "Overread" Agreement, Dr. Mandalapu was the first (and only) physician to interpret the test results and thus there was nothing to "overread."

180. Magnuson is also the signatory for Sleep Source on the Overread Agreement that Philbrick provided to Dr. Mandalapu as well as on the aforementioned "Technical Summary Agreement."

181. Dr. Mandalapu has refused to sign the Overread Agreement.

182. In addition to making money by interpreting EEGs, Defendants offered Dr. Mandalapu the same kickback arrangement they offered to Dr. Chava. In particular, Philbrick provided Dr. Mandalapu with an EEG Interpretation Agreement that would pay Dr. Mandalapu a kickback payment for each patient that he referred to Alliance for an Ambulatory EEG without actually being required to perform any interpretation services

183. Dr. Mandalapu refused to sign the EEG Interpretation Agreement.

184. Moreover, Dr. Mandalapu expressed concern with Alliance sales representative Dan Philbrick as to the regulatory implications inherent in Alliance's arrangements with ordering healthcare providers. Philbrick responded that Alliance had discovered loopholes that permitted the kickback arrangement.

185. In approximately December 2016, Dr. Mandalapu stopped referring his patients to Alliance for ambulatory EEGs.

186. After Dr. Mandalapu stopped referring his patients to Alliance, Philbrick told Dr. Mandalapu that Alliance would no longer be using him to perform expert interpretations of Defendants' ambulatory EEGs. Alliance largely followed through with this threat. The only ambulatory EEGs that Alliance continued to send to Dr. Mandalapu were those ordered by a nurse practitioner and psychiatrist who had expressly requested that Dr. Mandalapu perform interpretations for their patients. Dr. Mandalapu no longer performs services for Alliance.

## C.    Alliance's "Medical Assistant Program" Furthered the Kickback Scheme

187. Not only did Alliance offer remuneration directly to doctors vis-à-vis the professional component kickback and cross-referral scheme set out above, Alliance offered certain physicians and practices the opportunity to hire "Medical Assistants" from Alliance as part of Alliance's "Medical Assistant Program" (also known as Alliance's "Annual Wellness Program.").

188. The primary purpose of the Medical Assistant Program was and remains to place Alliance-employed Medical Assistants at practices involved in Alliance's kickback scheme in order to identify Medicare patients whom Alliance believes may be colorable targets for VAEEG referrals.

37

189. To that end, one of, if not the, primary role of the Medical Assistant Program is to encourage and allow doctors to perform Annual Wellness Visits (an annual appointment offered to Medicare patients) ("AWV") on Medicare patients as a means to trigger further referrals to Alliance for VAEEG and sleep tests.

190. Alliance's Medical Assistants would perform the AWV, review patient medical records, and identify patients who Alliance believed could be candidates for the billing of an Alliance VAEEG and/or sleep test.

191. Participating healthcare providers thus maximize their ability to avail themselves of Alliance's professional component kickback arrangement.

192. Moreover, Alliance's sales representatives communicate with the Medical Assistants to obtain referrals for Alliance's EEG and sleep study services.

193. Given that the AWV is a patient benefit specific to those covered by Medicare, this scheme targeted Medicare patients and public funds.

194. Medicare has no pre-approval/prior authorization requirements for ambulatory EEG services. Accordingly, Medicare patients are among the, if not *the*, lowest hanging fruit for Alliance to target. Due to the exceptionally high costs of video ambulatory EEGs (which cost insurers thousands of dollars) and the rarity that a video ambulatory EEG is actually medically necessary, many other insurers have pre-approval/prior authorization requirements for ambulatory EEG services that provide additional safeguards against the ordering of medically unnecessary tests. Accordingly, for many non-Medicare patients it is often more difficult for healthcare providers to avail themselves of Alliance's kickback.

195. On at least one occasion, one of Alliance's Medical Assistants, D.B., data-mined patient records from a primary care practice in search of patients on anticonvulsants (who would have already suffered from *diagnosed* epileptic conditions and have been diagnosed drugs to

treat said condition) in order to encourage the referring physician to order VAEEG services from Defendants to analyze a condition that had already been diagnosed and treated.

196. The Medical Assistants also fill out referral forms for Alliance's tests for the referring doctors and are involved in determining whether the tests are medically necessary.

197. The Medical Assistants' services encourage and facilitate the referral of patients to Alliance.

198. The Medical Assistant Program was a kickback in the most typical sense in that its primary purpose was to provide a tangible benefit (the aforementioned Medical Assistant services) to doctors who referred large numbers of patients to Defendants and/or physicians who had the potential to refer patients to Alliance in the future. That is, the purpose of the program was to induce and reward doctors for referring patients to Alliance for VAEEG and/or sleep study services.

199. Lastly, the Medical Assistant Program runs afoul of 42 C.F.R. § 1001.952(d)(6) in that "involve[d] the counselling [sic] or promotion of a business arrangement or other activity that violates any State or Federal law" (i.e., federal and state laws against providing kickbacks to physicians for the referral of diagnostic tests). 42 C.F.R. § 1001.952(d)(6).

200. Accordingly, the Medical Assistant Program runs afoul of the federal Anti-Kickback Statute and state law anti-kickback statutes and all claims to government insurers tainted by Medical Assistant Program are "legally false."

**D.    Defendants Had Knowledge of the Illicit Nature of the Kickback Scheme**

201. At all times relevant, Defendants knew that the compensation, cross-referral, and Medical Assistant arrangements they offered as inducements to referring physicians were kickbacks.

202.	Alliance's sales force emphasized to physicians across the country, including Dr. Mandalapu and Dr. Chava, that Alliance would pay hundreds to thousands of dollars to those physicians (or the opportunity to obtain such sums of money) for each patient that they refer to Alliance for an Ambulatory EEG.

203.	Alliance's own Medical Necessity Handout specifically describes the *Medicare* reimbursement of "$900 per 72 hour study" that physicians can receive from referring their patients to Alliance as "[a]ncillary [i]ncome" and an "[a]dded [b]enefit[]."

204.	Alliance's Medical Assistant Program was focused on identifying Medicare patients for kickback-tainted referrals and otherwise encouraging and facilitating such referrals.

205.	At all times relevant to this Complaint, Defendants knew that the EEG Interpretation and Sleep Study Agreements were a sham used as a cover for providing illegal kickbacks to referring physicians.

206.	At all times relevant to this Complaint, Defendants knew that the referring providers who signed an EEG Interpretation or Sleep Study Agreement were not actually interpreting any EEG or sleep study results.

207.	Instead, Alliance, Sleep Source, and/or RSS contracted with neurologists, like Dr. Mandalapu, to interpret ambulatory EEGs and/or sleep studies in order to provide a written expert interpretation report.

208.	Defendants knew that the referring providers who signed their EEG Interpretation and/or Sleep Study Agreements simply signed their name on the written expert interpretation report, as the Interpreting Physician.

209.	Defendants further knew that most of the referring providers who signed an EEG or Sleep Study Interpretation Agreement lacked the medical training and experience to provide interpretation services for the EEG or sleep study tests performed by Alliance.

210. At all times relevant to this Complaint, Defendants knew that the sham EEG and Sleep Study Interpretation Agreements constituted an unlawful inducement in violation of the federal Anti-Kickback Statute and analogous state Anti-Kickback laws.

211. Defendants further knew that it violated the federal Anti-Kickback Statute and analogous state Anti-Kickback laws to require doctors, like Dr. Mandalapu, to refer their patients to Alliance for ambulatory EEGs as a condition for being paid by Alliance, RSS, or Sleep Source for performing interpretation services.

212. At all times relevant, Defendants knew that the Medical Assistant Program was used to induce physicians and practices to refer patients to Alliance for testing and that the Medical Assistant program otherwise counseled and encourage healthcare providers to do so.

213. Defendants, at all times relevant, knew that the Medical Assistant Program constituted an unlawful inducement in violation of the federal Anti-Kickback Statute and analogous state Anti-Kickback laws.

214. At all times relevant to this Complaint, Defendants were aware of the prohibitions of the federal Anti-Kickback Statute and analogous state Anti-Kickback laws.

215. In fact, Sleep Source's EEG Interpretation Agreement expressly states, in bold typeface, that "PPS and Interpreting Physician recognize that federal and state laws prohibit them from offering, paying, soliciting, or receiving remuneration in any form in return for referring patients, recommending healthcare items or services, or otherwise generating healthcare business for, or between each other, [and] related parties." *See* Ex. A, § 10.8.

216. Similarly, Sleep Source's Overread Agreement expressly states, in bold typeface, that "PPS and Physician recognize that federal and state laws prohibit them from offering, paying, soliciting, or receiving remuneration in any form in return for referring patients,

recommending healthcare items or services, or otherwise generating healthcare business for, or between each other, [and] related parties." *See* Ex. B, § 10.8.

217.   Sleep Source's Sleep Study Interpretation Agreement expressly states, in bold typeface, that "PPS and Interpreting Physician recognize that federal and state laws prohibit them from offering, paying, soliciting, or receiving remuneration in any form in return for referring patients, recommending healthcare items or services, or otherwise generating health care business for, between, or among each other, [and] related parties." *See* Ex. C, § 10.8.

218.   These actions have damaged the public and the government payors at issue in this Complaint by inducing EEG and sleep study referrals to Defendants.   Defendants have also caused these government payors to reimburse Defendants for services that were not performed by the referring physicians (i.e the interpretive services).

219.   In addition, in some cases the ambulatory EEG tests and sleep studies may not have been medically necessary.   Providers may have ordered the ambulatory EEGs, an excessively lengthy EEG, or a sleep study in order to reap the financial benefits offered by Defendants.

## VII.   DEFENDANTS' COMPENSATION ARRANGEMENT VIOLATES THE ANTI-KICKBACK STATUTE

220.   Defendants' arrangements to compensate healthcare providers that order EEG or sleep study tests from Alliance, as described herein, run afoul of the Anti-Kickback Statute and analogous state Anti-Kickback laws.

221.   The purpose and intent of Alliance's kickback arrangement, as relayed and offered to Dr. Chava and Dr. Mandalapu, is to induce healthcare providers to order EEG or sleep study tests from Defendants. See 42 U.S.C. § 1320a-7b(a).

222.    The fraud has involved patients who partake in government healthcare programs, including, but not limited to, Medicaid and Medicare. Id.

223.    The funds provided to the ordering providers are kickbacks and/or bribes and therefore a form of remuneration under the Anti-Kickback Statute. 42 U.S.C. § 1320a-7b(b)(1).

224.    These arrangements do not fall into the "safe harbor" provisions set out at 42 C.F.R. § 1001.952.

225.    Given the structure of the kickback scheme and Alliance's sales representatives' focus on providing income to physicians on a volume basis, one of, and indeed the primary, purpose of this arrangement was and is to induce providers to order EEG and sleep study tests from Alliance.

226.    The incentive for a provider to not just order a test from Alliance but also to order an unnecessary test — or extend a test for additional hours or days — is palpable and substantial.

227.    Patients are harmed, not simply because they are forced to pay the co-pays associated with the procedures, but also because they are mostly homebound during the procedures. Moreover, during an ambulatory EEG, electrodes and wires are attached to the patient's head, a less than comfortable experience.

228.    Accordingly, all claims submitted to government insurers pursuant to referral arrangements prohibited by the Anti-Kickback Statute are "legally false."

**VIII.   DEFENDANTS BILLED FOR DIGITAL ANALYSIS OF EEGS (CPT 95957) THAT WERE MEDICALLY UNNECESSARY AND/OR WERE NOT PERFORMED**

229.    Alliance sales representative Dan Philbrick provided Dr. Mandalapu with a pre-printed form for him to use when referring patients to Defendants for Video Monitored EEGs (which Alliance billed under CPT Code 95951) ("Video Monitored EEG Order Form").

230. Alliance's Video Monitored EEG Order Form specifically states that "All Procedures [for 'Long-Term Video Ambulatory EEG (95951)'] Include Digital Spike and Seizure Analysis (95957) and ECG [electrocardiogram]."

231. Alliance, RSS, and Sleep Source, therefore, bill insurers, including government funded healthcare programs, for a Digital Spike and Seizure Analysis using CPT Code 95957 every time they perform an Ambulatory EEG using CPT Code 95951.

232. CPT Code 95957 should not be automatically added-on to every Ambulatory EEG .

233. Rather, CPT Code 95957 should only be billed when substantial additional digital analysis was medically necessary and was actually performed. This is to occur only in exceptional circumstances.

234. As noted *supra* at ¶ 106, the American Medical Association, which creates and manages the CPT standard, has made clear that CPT Code 95957 "should not be used for digital EEG recording, spike detection, or seizure detection" and, relatedly, that "[i]t is not appropriate to report code 95957 for source localization when there are no spikes to analyze (e.g., when the video-EEG monitoring is normal)." American Medical Association, CPT Assistant, Nov. 2010:6. The AMA has further noted that "[m]any patients receive video-EEG monitoring for other reasons such as differential diagnosis, and in those cases, code 95957 is not likely to be medical necessary."

235. By automatically adding CPT Code 95957 onto every ambulatory EEG bill, Defendants submitted, and/or caused the submission of, numerous claims to government healthcare programs for CPT Code 95957 that lacked the requisite medical necessity and for services that were not, in fact, performed.

236.  Additionally, when performing "expert interpretations" of Alliance's EEGs, Dr. Mandalapu observed no evidence that Defendants had actually performed a Digital Spike and Seizure Analysis justifying a charge under CPT Code 95957. Defendants never requested that Dr. Mandalapu perform such analysis and, in any event, in most cases there were no spikes to analyze given that the results of the test showed no abnormality.

237.  Accordingly, even if a Digital Spike and Seizure Analysis under CPT Code 95957 may have been medically necessary in a given case, Dr. Mandalapu observed no evidence in the patient's record that Alliance, or any of its subsidiaries, had actually performed the work necessary to bill government healthcare programs for that service.

238.  Alliance, RSS, and Sleep Source have thus billed government insurers for CPT Code 95957 services that were not, in fact, performed.

239.  In 2014, Defendant RSS billed Medicare for more Digital Spike and Seizure Analysis under CPT Code 95957 than any other provider in the United States.

240.  At all times relevant, Defendants were aware that Alliance was not performing the services associated with CPT Code 95957 and that any such services would, relatedly, have been medically unnecessary. In fact, Dr. Mandalapu explained to Misty Norris, Alliance's then Product Manager for EEGs, that it appeared that Alliance was improperly billing code 95957. Alliance, RSS, and Sleep Source nevertheless knowingly billed government insurers for such services.

## IX.  CAUSES OF ACTION

### COUNT I- Violation of the Federal False Claims Act
### 31 U.S.C. § 3729(A)(1)(A), (B)

241.  Relators incorporate the averments of paragraphs 1 through 240 as if set forth in full herein.

242. Claims that Defendants submitted or caused to be submitted nationwide to federally- or state-funded health care programs, including Medicare and Medicaid, related to professional services that were not medically necessary or were not provided constitute violations of the federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

243. Claims that Defendants submitted or caused to be submitted that violate the federal Anti-Kickback Statute constitute violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

244. The claims knowingly made by Defendants nationwide to federally- or state-funded health care programs related to false records of professional services that were not medically necessary or were not provided constitute violations of the federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

245. The false records or statements were the patient records and bills which (a) misrepresented the level of service that was medically necessary and/or (b) misrepresented that professional services were provided to the patient, and certifications and representations of full compliance with all federal and state laws, including, but not limited to, the federal Anti-Kickback Statute.

246. All of Defendants' conduct described in this Complaint was knowing, as that term is used in the federal False Claims Act.

**WHEREFORE**, Relators request the following relief:

A. Judgment against Defendants for three times the amount of damages the United States has sustained because of their actions, plus the maximum civil penalty allowed by law for each violation of the federal False Claims Act;

B. Twenty-five percent (25%) of the proceeds of this action if the United States elects to intervene, and thirty percent (30%) if it does not;

> C. Their attorneys' fees, litigation and investigation costs, and expenses; and

> D. Such other relief as the Court deems just and appropriate.

## COUNT II - VIOLATION OF THE FEDERAL FALSE CLAIMS ACT
## 31 U.S.C. § 3729(A)(1)(C) CONSPIRACY

247. Relators incorporate the averments of paragraphs 1 through 246 as if set forth in full herein.

248. Defendants, in their agreements with healthcare providers to order unnecessary tests in exchange for illicit remuneration, and, as to Ancor, through its agreement to acquire Alliance, partner with Alliance, take a managerial role in Alliance's business, and finance Alliance's illegal activity, engaged in a concerted effort to carry out Defendants' fraudulent scheme to bill for professional services that were not medically necessary or were not provided, conspired to defraud the federal government by submitting false or fraudulent claims (including those related to unnecessary services, as well as those claims related to referrals tainted by violations of the federal Anti-Kickback Statute) which were paid by the government in violation of the federal False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

**WHEREFORE**, Relators request the following relief:

> A. Judgment against Defendants for three times the amount of damages the United States has sustained because of their actions, plus the maximum civil penalty allowed by law for each violation of the federal False Claims Act;

> B. Twenty-five percent (25%) of the proceeds of this action if the United States elects to intervene, and thirty percent (30%) if it does not;

> C. Their attorneys' fees, litigation and investigation costs, and expenses; and

> D. Such other relief as the Court deems just and

appropriate.

## COUNT III- NEW JERSEY FALSE CLAIMS ACT
### N.J. Stat. §§ 2A:32C-1, *et seq.*

249. Relators incorporate Paragraphs 1 through 248 as through fully set forth herein.

250. The allegations in this count are made upon information and belief.

251. This is a claim brought by Relators on behalf of the State of New Jersey against Defendants pursuant to the New Jersey False Claims Act for treble damages and penalties.

252. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented or caused to be presented, and are still presenting, to an employee, officer or agent of the State of new Jersey, or to any contractor, grantee, or other recipient of State funds, false or fraudulent claims for payment or approval, in violation of N.J. Stat. § 2A:32C-3(a).

253. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the New Jersey State Government to approve or pay such false and fraudulent claims.

254. By virtue of the conduct described herein, the Defendants conspired to violate the New Jersey False Claims Act.

255. By virtue of the acts described above, Defendants have violated and continue to violate the New Jersey Anti-Kickback Statute, N.J. Stat. § 30:40D-17.

256. The State of New Jersey, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and continues to pay for services for recipients of Medicaid.

257. As a result of Defendants' actions, as set forth above, the State of New Jersey

and/or its political subdivisions have been, and continue to be, severely damaged.

258. The State of New Jersey is entitled to a civil penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

**WHEREFORE,** Relators request the following relief:

A. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New Jersey has sustained because of Defendants' actions, plus the maximum civil penalty allowed by law for each violation of N.J. Stat. § 2A:32C-3(a), (b), (c), and (g)

B. Twenty five percent (25%) of the proceeds of this action to the Relator if the State of New Jersey elects to intervene, and 30% if it does not;

C. Relators' attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

D. Such other relief as the Court deems just and appropriate.

## COUNT IV – CALIFORNIA FALSE CLAIMS ACT
### Cal. Gov't Code §§ 12650, *et seq.*

259. Relators incorporate Paragraphs 1 through 258 as though fully set forth herein.

260. The allegations in this count are made upon information and belief.

261. This is a claim for treble damages and penalties under the California False Claims Act.

262. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the California State Government for payment or approval.

263. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the California State Government to approve or pay such false and fraudulent claims.

264. By virtue of the acts described above, Defendants conspired to violate the California False Claims Act.

265. By virtue of the acts described above, Defendants have violated and continues to violate California laws prohibiting the payment or receipt of bribes or kickbacks, namely Cal. Bus. & Prof. Code § 650, Cal. Welfare & Inst. Code § 14107.2, and Cal. Health & Safety Code § 445.

266. The California State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be presented by Defendants, paid and continues to pay the claims that are non-payable as a result of Defendants' illegal inducements.

267. By reason of the Defendants' acts, the State of California has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

268. The State of California is entitled to a civil penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

**WHEREFORE**, Relators request the following relief:

A. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of California has sustained because of Defendant's actions, plus the maximum civil penalty allowed by law for each violation of Cal. Gov't Code § 12651(a)(1), (2), (3), and (7).

B. Thirty three percent (33%) of the proceeds of this action to the Relators if the State of California elects to intervene, and 50% if it does not;

C.  Relators' attorneys' fees, litigation and investigation costs, and other related expenses; and

D.  Such other relief as the Court deems just and appropriate.

## COUNT V- FLORIDA FALSE CLAIMS ACT
### Fla. Stat. §§ 68.081, *et seq.*

269.  Relators incorporate Paragraphs 1 through 268 as though fully set forth herein.

270.  The allegations in this count are made upon information and belief.

271.  This is a claim for treble damages and penalties under the Florida False Claims Act, Fla. Stat. § 68.082(2).

272.  By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

273.  By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts to induce the Florida State Government to approve or pay such false and fraudulent claims.

274.  By virtue of the conduct described herein, Defendants conspired to violate the Florida False Claims Act.

275.  By virtue of the acts described above, Defendants have violated and continues to violate Florida law prohibiting the payment or receipt of bribes or kickbacks, namely Fla. Stat. § 456.054 and Fla. Stat. § 409.920.

276.  The Florida State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal inducements.

277.  Defendants knowingly submitted and/or caused to be made or used false records

or false statements in order to avoid or to decrease their respective obligations to return overpayments of Florida state funds.

278. By reason of the Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

279. The State of Florida is entitled to a civil penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

**WHEREFORE**, Relators request the following relief:

A. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Florida has sustained because of Defendants' actions, plus the maximum civil penalty allowed by law for each violation of Fla. Stat. § 68.082(2)(a), (b), (c), and (g).

B. Twenty five percent (25%) of the proceeds of this action to the Relators if the State of Florida elects to intervene, and 30% if it does not;

C. Relators' attorneys' fees, litigation and investigation costs, the costs of the audit, and other related expenses; and

D. Such other relief as the Court deems just and appropriate.

## COUNT VI- GEORGIA STATE FALSE MEDICAID
### CLAIMS ACT
### Ga. Code §§ 49-4-168, *et seq.*

280. Relators incorporate Paragraphs 1 through 279 as though fully set forth herein.

281. The allegations in this count are made upon information and belief.

282. This is a claim for treble damages and penalties under the Georgia State False Medicaid Claims Act.

283. By virtue of the acts described above, Defendants knowingly presented or caused to be presented false or fraudulent claims to the Georgia State Government for payment or

approval.

284. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the Georgia State Government to approve or pay such false and fraudulent claims.

285. By virtue of the acts described above, Defendants conspired to violate the Georgia State False Medicaid Claims Act.

286. By virtue of the acts described above, Defendants have violated and continue to violate Georgia's Patient Self-Referral Act, Ga. Code § 43-1B-4.

287. The Georgia State Government, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal inducements.

288. Defendants knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease their respective obligations to return overpayments of state funds to the Georgia State Government.

289. By reason of Defendants' acts, the State of Georgia has been damaged, and continues to be damaged in a substantial amount to be determined at trial.

290. The State of Georgia is entitled to a civil penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

**WHEREFORE**, Relators request the following relief:

A. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Georgia has sustained because of Defendants' actions, plus the maximum civil penalty allowed by law for each violation of Ga. Code § 49-4-168.1 (a)(1), (2), (3), and (7).

B.      Twenty five percent (25%) of the proceeds of this action to the Relators if the State of Georgia elects to intervene, and 30% if it does not;

C.      Relators' attorneys' fees, litigation and investigation costs, and other related expenses; and

D.      Such other relief as the Court deems just and appropriate.

## COUNT VII– NEVADA FALSE CLAIMS ACT
### Nev. Rev. Stat. § 357.040(1)

291.    Relators incorporate Paragraphs 1 through 290 as though fully set forth herein.

292.    The allegations in this count are made upon information and belief.

293.    This is a claim for damages and penalties under the Nevada False Claims Act.

294.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented false or fraudulent claims to the Nevada State Government for payment or approval in violation of Nev. Rev. Stat. § 357.040(1)(a).

295.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the Nevada State Government to approve or pay such false and fraudulent claims in violation of Nev. Rev. Stat. § 357.040(1)(b).

296.    By virtue of the conduct described herein, Defendants conspired to violate the Nevada False Claims Act.

297.    By virtue of the acts described above, Defendants have violated and continue to violate Nevada law prohibiting the payment of kickbacks to healthcare providers, namely Nev. Rev. Stat. § 422.560 and Nev. Rev. Stat. § 439B.420.

298.    The State of Nevada, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be presented by Defendants, paid and continues to pay the

claims that are non-payable as a result of Defendants' illegal inducements.

299. Defendants knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease their respective obligations to return overpayments of Nevada state funds.

300. By reason of Defendants' acts, the State of Nevada has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

301. The State of Nevada is entitled to a civil penalty for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**WHEREFORE**, Relators request the following relief:

A. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Nevada has sustained because of Defendant's actions, plus the maximum civil penalty allowed by law for each violation of Nev. Rev. Stat. § 357.040(1);

B. Twenty five percent (25%) of the proceeds of this action to the Relators if the State of Nevada elects to intervene, and thirty percent (30%) if it does not;

C. Relators' attorneys' fees, litigation and investigation costs, and other related expenses; and

D. Such other relief as the Court deems just and appropriate.

## COUNT VIII -TENNESSEE MEDICAID FALSE CLAIMS ACT
### Tenn. Code §§ 71-5-181, *et seq.*

302. Relators incorporate Paragraphs 1 through 301 as though fully set forth herein.

303. The allegations in this count are made upon information and belief.

304. This is a claim for treble damages and penalties under the Tennessee Medicaid False Claims Act.

305. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

306. By virtue of the acts described above, Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the Tennessee State Government to approve or pay such false and fraudulent claims.

307. By virtue of the conduct described herein, the Defendants conspired to violate the Tennessee Medicaid False Claims Act.

308. By virtue of the acts described above, Defendants have violated and continue to violate Tennessee law prohibiting the payment of kickbacks to healthcare providers, namely Tenn. Code § 68-29-129, Tenn. Comp. R. & Regs. 1200-13-13-.08, and Tenn. Comp. R. & Regs. 1200-13-14-.08.

309. The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendants, paid and continues to pay the claims that are non-payable as a result of Defendant's illegal inducements.

310. By reason of the Defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

311. The State of Tennessee is entitled to a civil penalty for each and every false or fraudulent claim, record or statement made, used, presented, or caused to be made, used, or presented by Defendants.

**WHEREFORE**, Relators request the following relief:

A. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Tennessee has sustained because of Defendants' actions, plus the maximum civil penalty

allowed by law for each violation of Tenn. Code § 71-5-182(a)(1)(A), (B), (C), and (D);

B.     Twenty-five percent (25%) of the proceeds of this action to the Relators if the State of Tennessee elects to intervene, and thirty percent (30%) if it does not;

C.     Relators' attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

D.     Such other relief as the Court deems just and appropriate.

## COUNT IV-TEXAS MEDICAID FRAUD PREVENTION ACT
### Tex. Hum. Res. Code §§ 36.001, *et seq.*

312.     Relator incorporates Paragraphs 1 through 311 as though fully set forth herein.

313.     This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Act.

314.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Texas State Government for payment or approval.

315.     By virtue of the acts described above, Defendants knowingly made, used or caused to be made or used false records and statements, and omitted material facts to induce the Texas State Government to approve or pay such false and fraudulent claims.

316.     By virtue of the conduct described herein, Defendants conspired with the ordering healthcare providers to violate the Texas Medicaid Fraud Prevention Act.

317.     By virtue of the acts described above, Defendants have violated and continue to violate Texas law prohibiting the payment or receipt of bribes or kickbacks, namely Texas Human Resources Code § 32.039 and Texas Administrative Code § 371.1669.

318.     The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendants, paid and continues to

pay the claims that are non-payable as a result of Defendants' illegal inducements.

319. Defendants knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease their respective obligations to return overpayments of Texas state funds.

320. By reason of the Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

321. The State of Texas is entitled to a civil penalty for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**WHEREFORE**, Relators request the following relief:

A. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Texas has sustained because of Defendants' actions, plus the maximum civil penalty allowed by law for each violation of Tex. Hum. Res. Code § 36.002;

B. Twenty-five percent (25%) of the proceeds of this action to the Relators if the State of Texas elects to intervene, and thirty percent (30%) if it does not;

C. Relators' attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

D. Such other relief as the Court deems just and appropriate.

## COUNT X- VIRGINIA FRAUD AGAINST TAXPAYERS ACT
### Va. Code §§ 8.01-216.1, *et seq.*

322. Relators incorporate Paragraphs 1 through 321 as though fully set forth herein.

323. The allegations in this count are made upon information and belief.

324. This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

325. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Commonwealth of Virginia for payment or approval.

326. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the Commonwealth of Virginia to approve or pay such false and fraudulent claims.

327. By virtue of the conduct described herein, Defendants conspired with healthcare providers to violate the Virginia Fraud Against Taxpayers Act.

328. By virtue of the acts described above, Defendants have violated and continues to violate Virginia law prohibiting the payment or receipt of bribes or kickbacks to healthcare providers, namely Va. Code § 32.1-315, as well as that concerning false statements and misrepresentations, namely Va. Code § 32.1-312 and Va. Code § 8.01-216.1, *et seq.*

329. The Commonwealth of Virginia, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be presented by Defendants, paid and continues to pay the claims that are non-payable as a result of Defendants' illegal inducements.

330. Defendants knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease their respective obligations to return overpayments to the Commonwealth of Virginia.

331. By reason of Defendants' acts, the Commonwealth of Virginia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

332. The Commonwealth of Virginia is entitled a civil penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

**WHEREFORE**, Relators request the following relief:

A.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the Commonwealth of Virginia has sustained because of Defendants' actions, plus the maximum civil penalty allowed by law for each violation of Va. Code § 8.01-216.3;

B.    Twenty five percent (25%) of the proceeds of this action to the Relator if the Commonwealth of Virginia elects to intervene, and thirty percent (30%) if it does not;

C.    Relators' attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

D.    Such other relief as the Court deems just and appropriate.

## COUNT XI- DISTRICT OF COLUMBIA FALSE CLAIMS ACT
### D.C. Code §§ 2-381.01, *et seq.*

333.    Relators incorporate Paragraphs 1 through 332 as though fully set forth herein.

334.    The allegations in this count are made upon information and belief.

335.    This is a claim for treble damages and penalties under the District of Columbia False Claims Act.

336.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the District of Columbia for payment or approval.

337.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the District of Columbia to approve or pay such false and fraudulent claims.

338.    By virtue of the conduct described herein, Defendants conspired with healthcare providers to violate the District of Columbia False Claims Act.

339. By virtue of the acts described above, Defendants have violated and continue to violate District of Columbia law prohibiting the solicitation and payment of kickbacks, namely District of Columbia Code § 3-1205.14 and District of Columbia Code § 4-802.

340. The District of Columbia, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be presented by Defendants, paid and continues to pay the claims that are non-payable as a result of Defendants' illegal inducements.

341. Defendants knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease their respective obligations to return overpayments to the District of Columbia.

342. By reason of Defendants' acts, the District of Columbia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

343. The District of Columbia is entitled a civil penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

**WHEREFORE**, Relators request the following relief:

A. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the District of Columbia has sustained because of Defendants' actions, plus the maximum civil penalty allowed by law for each violation of D.C. Code § 2-381.02;

B. Twenty five percent (25%) of the proceeds of this action to the Relator if the District of Columbia elects to intervene, and thirty percent (30%) if it does not;

C. Relators' attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

D. Such other relief as the Court deems just and appropriate.

## COUNT XII- COLORADO FALSE CLAIMS ACT
## Colo. Rev. Stat. § 25.5-4-303.5, *et seq.*

344. Relators incorporate Paragraphs 1 through 343 as though fully set forth herein.

345. The allegations in this count are made upon information and belief.

346. This is a claim for treble damages and penalties under the Colorado False Claims Act.

347. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the State of Colorado for payment or approval.

348. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the state of Colorado to approve or pay such false and fraudulent claims.

349. By virtue of the conduct described herein, Defendants conspired with healthcare providers to violate the Colorado False Claims Act.

350. The State of Colorado, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be presented by Defendants, paid and continues to pay the claims that are non-payable as a result of Defendants' illegal inducements.

351. Defendants knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease their respective obligations to return overpayments to the State of Colorado.

352. By reason of Defendants' acts, the State of Colorado has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

353. The State of Colorado is entitled a civil penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

**WHEREFORE**, Relators request the following relief:

A. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Colorado has sustained because of Defendants' actions, plus the maximum civil penalty allowed by law for each violation of Colo. Rev. Stat. § 25.5-4-303.5, *et seq.*;

B. Twenty five percent (25%) of the proceeds of this action to the Relator if the State of Colorado elects to intervene, and thirty percent (30%) if it does not;

C. Relators' attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

D. Such other relief as the Court deems just and appropriate.

## COUNT XIII- ILLINOIS FALSE CLAIMS ACT
## 740 Ill. Comp. Stat. 175/1, *et seq.*

354. Relators incorporate Paragraphs 1 through 353 as though fully set forth herein.

355. The allegations in this count are made upon information and belief.

356. This is a claim for treble damages and penalties under the Illinois False Claims Act.

357. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the State of Illinois for payment or approval.

358. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the State of Illinois to approve or pay such false and fraudulent claims.

359. By virtue of the conduct described herein, Defendants conspired with healthcare providers to violate the Illinois False Claims Act.

360. By virtue of the conduct described herein, Defendants have violated 740 Ill. Comp. Stat. 92/5 concerning the offering and payment of kickbacks to healthcare providers.

361. The State of Illinois, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be presented by Defendants, paid and continues to pay the claims that are non-payable as a result of Defendant's illegal inducements.

362. Defendants knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease their respective obligations to return overpayments to the State of Illinois.

363. By reason of Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

364. The State of Illinois is entitled a civil penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

**WHEREFORE**, Relators request the following relief:

A. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Illinois has sustained because of Defendants' actions, plus the maximum civil penalty allowed by law for each violation of 740 Ill. Comp. Stat. 175/1;

B. Twenty five percent (25%) of the proceeds of this action to the Relator if the State of Illinois elects to intervene, and thirty percent (30%) if it does not;

C. Relators' attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

D. Such other relief as the Court deems just and appropriate.

## COUNT XIII- INDIANA FALSE CLAIMS AND
## WHISTLEBLOWER PROTECTION ACT
### Ind. Code § 5-11-5.5-1, *et seq.*

365.    Relators incorporate Paragraphs 1 through 365 as though fully set forth herein.

366.    The allegations in this count are made upon information and belief.

367.    This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act.

368.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the State of Indiana for payment or approval.

369.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the State of Indiana to approve or pay such false and fraudulent claims.

370.    By virtue of the conduct described herein, Defendants conspired with healthcare providers to violate the Indiana False Claims and Whistleblower Protection Act.

371.    By virtue of the conduct described herein, Defendants have offered and paid kickbacks to healthcare providers in violation of Ind. Code Ann. § 12-15-24-2.

372.    The State of Indiana, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be presented by Defendants, paid and continues to pay the claims that are non-payable as a result of Defendants' illegal inducements.

373.    Defendants knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease their respective obligations to return overpayments to the State of Indiana.

374.    By reason of Defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

375.    The State of Indiana is entitled a civil penalty for each and every false or

fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

WHEREFORE, Relators request the following relief:

A. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Indiana has sustained because of Defendants' actions, plus the maximum civil penalty allowed by law for each violation of Ind. Code § 5-11-5.5-2.

B. Twenty five percent (25%) of the proceeds of this action to the Relator if the State of Indiana elects to intervene, and thirty percent (30%) if it does not;

C. Relator's attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

D. Such other relief as the Court deems just and appropriate.

## COUNT XIV- NORTH CAROLINA FALSE CLAIMS ACT
### N.C. Gen. Stat. § 1-605, *et seq.*

376. Relators incorporate Paragraphs 1 through 375 as though fully set forth herein.

377. The allegations in this count are made upon information and belief.

378. This is a claim for treble damages and penalties under the North Carolina False Claims Act.

379. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the State of North Carolina for payment or approval.

380. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the State of North Carolina to approve or pay such false and fraudulent claims.

381. By virtue of the conduct described herein, Defendants conspired with healthcare providers to violate the North Carolina False Claims Act.

382. By virtue of the acts described above, Defendants violated N.C. Gen. Stat. § 90-401, which bars providing healthcare providers compensation for the referral of patients.

383. The State of North Carolina, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be presented by Defendants, paid and continues to pay the claims that are non-payable as a result of Defendants' illegal inducements.

384. Defendants knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease their respective obligations to return overpayments to the State of North Carolina.

385. By reason of Defendants' acts, the State of North Carolina has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

386. The State of North Carolina is entitled a civil penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

**WHEREFORE**, Relators request the following relief:

A. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of North Carolina has sustained because of Defendants' actions, plus the maximum civil penalty allowed by law for each violation of N.C. Gen. Stat. § 1-607.

B. Twenty five percent (25%) of the proceeds of this action to the Relator if the State of North Carolina elects to intervene, and thirty percent (30%) if it does not;

C. Relators' attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

D. Such other relief as the Court deems just and appropriate.

## COUNT XV- LOUISIANA MEDICAL ASSISTANCE PROGRAM INTEGRITY LAW
### N.C. Gen. Stat. § 1-605, *et seq.*

387. Relators incorporate Paragraphs 1 through 386 as though fully set forth herein.

388. The allegations in this count are made upon information and belief.

389. This is a claim for treble damages and penalties under the Louisiana Medical Assistance Program Integrity Law.

390. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the State of Louisiana for payment or approval.

391. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the State of Louisiana to approve or pay such false and fraudulent claims.

392. By virtue of the acts described herein, Defendants have violated and continue to violate La. Stat. Ann. § 37:1745 which prohibits the offering and payment of remuneration for the referral of patients.

393. By virtue of the conduct described herein, Defendants conspired with healthcare providers to violate the Louisiana Medical Assistance Integrity Law.

394. The State of North Carolina, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be presented by Defendants, paid and continues to pay the claims that are non-payable as a result of Defendants' illegal inducements.

395. Defendants knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease their respective obligations to return overpayments to the State of Louisiana.

396. By reason of Defendants' acts, the State of Louisiana has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

397. The State of Louisiana is entitled a civil penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

**WHEREFORE**, Relators request the following relief:

A. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Louisiana has sustained because of Defendants' actions, plus the maximum civil penalty allowed by law for each violation of La. Stat. § 46:438.3.

B. Twenty five percent (25%) of the proceeds of this action to the Relator if the State of Louisiana elects to intervene, and thirty percent (30%) if it does not;

C. Relators' attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

D. Such other relief as the Court deems just and appropriate.

### COUNT XVI- MARYLAND FALSE CLAIMS ACT
### MD. GEN. PROVIS. § 8-101, *et seq.*

398. Relator incorporates Paragraphs 1 through 397 as though fully set forth herein.

399. The allegations in this count are made upon information and belief.

400. This is a claim for treble damages and penalties under the Maryland False Claims Act.

401. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the State of Maryland for payment or approval.

402. By virtue of the acts described above, Defendants knowingly made, used, or

caused to be made or used false records and statements and omitted material facts to induce the State of Maryland to approve or pay such false and fraudulent claims.

403. By virtue the conduct described herein, Defendants violated and continue to violate Maryland's Patient Referral Law, Md. Health Occ. Code Ann. § 1-301, et seq.

404. By virtue of the conduct described herein, Defendants conspired with healthcare providers to violate the Maryland False Claims Act.

405. By virtue of the acts described above, Defendants has violated and continues to violate Md. Crim. Law Code Ann. § 8-511 which bars the offering and provision of kickbacks to healthcare providers for the referral of patients whose medical coverage is funded by the state or federal government.

406. The State of Maryland, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be presented by Defendants, paid and continues to pay the claims that are non-payable as a result of Defendants' illegal inducements.

407. Defendants knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease their respective obligations to return overpayments to the State of Maryland.

408. By reason of Defendants' acts, the State of Maryland has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

409. The State of Maryland is entitled a civil penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

**WHEREFORE**, Relators request the following relief:

A. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Maryland has

70

sustained because of Defendants' actions, plus the maximum civil penalty allowed by law for each violation of the Maryland False Claims Act, MD. GEN. PROVIS. § 8-101, *et seq.*

B. Twenty five percent (25%) of the proceeds of this action to the Relator if the State of Maryland elects to intervene, and thirty percent (30%) if it does not;

C. Relators' attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

D. Such other relief as the Court deems just and appropriate.

## COUNT XVII- OKLAHOMA MEDICAID FALSE CLAIMS ACT
### Okla. Stat. tit. 63, § 5053, *et seq.*

410. Relators incorporate Paragraphs 1 through 409 as though fully set forth herein.

411. The allegations in this count are made upon information and belief.

412. This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act.

413. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the State of Oklahoma for payment or approval.

414. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the State of Oklahoma to approve or pay such false and fraudulent claims.

415. By virtue of the conduct described herein, Defendants have violated and continue to violate Okla. Stat. tit. 63, § 1-742, which prohibits the payment of kickbacks to healthcare providers for the referral of patients.

416. By virtue of the conduct described herein, Defendants conspired with healthcare providers to violate the Oklahoma Medicaid False Claims Act.

417. The State of Oklahoma, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be presented by Defendants, paid and continues to pay the claims that are non-payable as a result of Defendants' illegal inducements.

418. Defendants knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or to decrease their respective obligations to return overpayments to the State of Oklahoma.

419. By reason of Defendants' acts, the State of Oklahoma has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

420. The State of Oklahoma is entitled a civil penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

**WHEREFORE**, Relators request the following relief:

A. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Oklahoma has sustained because of Defendants' actions, plus the maximum civil penalty allowed by law for each violation of Okla. Stat. tit. 63, § 5053.1.

B. Twenty five percent (25%) of the proceeds of this action to the Relator if the State of Oklahoma elects to intervene, and thirty percent (30%) if it does not;

C. Relators' attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

D. Such other relief as the Court deems just and appropriate.

## COUNT XVIII- MASSACHUSETTS FALSE CLAIMS LAW
### Mass. Gen. Laws ch. 12, § 5A, *et seq.*

421. Relators incorporate Paragraphs 1 through 420 as through fully set forth herein.

422. The allegations in this count are made upon information and belief.

423. This is a claim brought by Relators on behalf of the State of Massachusetts against Defendants pursuant to the Massachusetts False Claims Law for treble damages and penalties.

424. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented or caused to be presented, and are still presenting, to an employee, officer or agent of the State of Massachusetts, or to any contractor, grantee, or other recipient of State funds, false or fraudulent claims for payment or approval, in violation of Mass. Gen. Laws ch. 12, § 5A, *et seq.*

425. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the Massachusetts State Government to approve or pay such false and fraudulent claims.

426. By virtue of the conduct described herein, the Defendants conspired to violate the Massachusetts False Claims Act.

427. By virtue of the acts described above, Defendants have violated and continues to violate the Massachusetts Anti-Kickback Law, Mass. Gen. Laws ch. 12, § 5A, *et seq.*

428. The State of Massachusetts, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and continues to pay for services for recipients of Medicaid.

429. As a result of Defendants' actions, as set forth above, the State of Massachusetts and/or its political subdivisions have been, and continue to be, severely damaged.

430. The State of Massachusetts is entitled to a civil penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

**WHEREFORE,** Relators request the following relief:

A.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Massachusetts has sustained because of Defendants' actions, plus the maximum civil penalty allowed by law for each violation of Mass. Gen. Laws ch. 12, § 5A, *et seq.*

B.     Twenty five percent (25%) of the proceeds of this action to the Relator if the State of Massachusetts elects to intervene, and 30% if it does not;

C.     Relators' attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

D.     Such other relief as the Court deems just and appropriate.

## COUNT XIX- MICHIGAN MEDICAID FALSE CLAIMS ACT
### Mich. Comp. Laws § 400.601, et seq.

431.     Relators incorporate Paragraphs 1 through 430 as through fully set forth herein.

432.     The allegations in this count are made upon information and belief.

433.     This is a claim brought by Relators on behalf of the State of Michigan against Defendants pursuant to the Michigan Medicaid False Claims Law for treble damages and penalties.

434.     Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented or caused to be presented, and are still presenting, to an employee, officer or agent of the State of Michigan, or to any contractor, grantee, or other recipient of State funds, false or fraudulent claims for payment or approval, in violation of Mich. Comp. Laws § 400.601, et seq.

435.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the

Michigan State Government to approve or pay such false and fraudulent claims.

436. By virtue of the conduct described herein, the Defendants conspired to violate the Michigan False Claims Act.

437. By virtue of the acts described above, Defendants have violated and continues to violate the anti-kickback prohibition of the Michigan False Claims Act, Mich. Comp. Laws § 400.604.

438. The State of Michigan, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and continues to pay for services for recipients of Medicaid.

439. As a result of Defendants' actions, as set forth above, the State of Michigan and/or its political subdivisions have been, and continue to be, severely damaged.

440. The State of Michigan is entitled to a civil penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

**WHEREFORE,** Relators request the following relief:

A. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Michigan has sustained because of Defendants' actions, plus the maximum civil penalty allowed by law for each violation of Mich. Comp. Laws § 400.601, *et seq.*

B. Twenty five percent (25%) of the proceeds of this action to the Relator if the State of Michigan elects to intervene, and 30% if it does not;

C. Relators' attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

D. Such other relief as the Court deems just and appropriate.

## COUNT XX- MINNESOTA FALSE CLAIMS ACT
## Minn. Stat. § 15C.01, et seq.

441. Relators incorporate Paragraphs 1 through 440 as through fully set forth herein.

442. The allegations in this count are made upon information and belief.

443. This is a claim brought by Relators on behalf of the State of Minnesota against Defendants pursuant to the Minnesota False Claims Law for treble damages and penalties.

444. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented or caused to be presented, and are still presenting, to an employee, officer or agent of the State of Minnesota, or to any contractor, grantee, or other recipient of State funds, false or fraudulent claims for payment or approval, in violation of Minn. Stat. § 15C.01, et seq.

445. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the Michigan State Government to approve or pay such false and fraudulent claims.

446. By virtue of the conduct described herein, the Defendants conspired to violate the Minnesota False Claims Act.

447. By virtue of the acts described above, Defendants have violated and continues to violate the anti-kickback prohibition of Minn. Stat. § 62J.23 and Minn. Adm. Code § 5221.0700.

448. The State of Minnesota, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and continues to pay for services for recipients of Medicaid.

449. As a result of Defendants' actions, as set forth above, the State of Minnesota and/or its political subdivisions have been, and continue to be, severely damaged.

450. The State of Minnesota is entitled to a civil penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

**WHEREFORE,** Relators request the following relief:

A. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Minnesota has sustained because of Defendants' actions, plus the maximum civil penalty allowed by law for each violation of Minn. Stat. § 15C.01, *et seq.*

B. Twenty five percent (25%) of the proceeds of this action to the Relator if the State of Minnesota elects to intervene, and 30% if it does not;

C. Relators' attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

D. Such other relief as the Court deems just and appropriate.

### COUNT XXI- NEW MEXICO MEDICAID FALSE CLAIMS ACT
### N.M. Stat. § 27-14-1, et seq.

451. Relators incorporate Paragraphs 1 through 450 as through fully set forth herein.

452. The allegations in this count are made upon information and belief.

453. This is a claim brought by Relators on behalf of the State of New Mexico against Defendants pursuant to the New Mexico Medicaid False Claims Law for treble damages and penalties.

454. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented or caused to be presented, and are still presenting, to an employee, officer or agent of the State of New Mexico, or to any contractor, grantee, or other recipient of State funds, false or fraudulent claims for payment or approval, in violation of N.M. Stat. § 27-

14-1, et seq.

455. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the New Mexico State Government to approve or pay such false and fraudulent claims.

456. By virtue of the conduct described herein, the Defendants conspired to violate the New Mexico Medicaid False Claims Act.

457. By virtue of the acts described above, Defendants have violated and continues to violate the anti-kickback prohibition of N.M. Stat. § 30-41-2.

458. The State of New Mexico, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and continues to pay for services for recipients of Medicaid.

459. As a result of Defendants' actions, as set forth above, the State of New Mexico and/or its political subdivisions have been, and continue to be, severely damaged.

460. The State of New Mexico is entitled to a civil penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

**WHEREFORE**, Relators request the following relief:

A. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New Mexico has sustained because of Defendants' actions, plus the maximum civil penalty allowed by law for each violation of N.M. Stat. § 27-14-1, *et seq.*

B. Twenty five percent (25%) of the proceeds of this action to the Relator if the State of New Mexico elects to intervene, and 30% if it does not;

C. Relators' attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

D.    Such other relief as the Court deems just and appropriate.

## COUNT XXII- RHODE ISLAND STATE FALSE CLAIMS ACT
### R.I. Gen. Laws § 9-1.1-1, et seq.

461.    Relators incorporate Paragraphs 1 through 460 as through fully set forth herein.

462.    The allegations in this count are made upon information and belief.

463.    This is a claim brought by Relators on behalf of the State of Rhode Island against Defendants pursuant to the Rhode Island State False Claims Law for treble damages and penalties.

464.    Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented or caused to be presented, and are still presenting, to an employee, officer or agent of the State of Rhode Island, or to any contractor, grantee, or other recipient of State funds, false or fraudulent claims for payment or approval, in violation of R.I. Gen. Laws § 9-1.1-1, et seq.

465.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the Rhode Island State Government to approve or pay such false and fraudulent claims.

466.    By virtue of the conduct described herein, the Defendants conspired to violate the Rhode Island State False Claims Act.

467.    By virtue of the acts described above, Defendants have violated and continues to violate the anti-kickback prohibition of R.I. Gen. Laws § 5-48.1-3.

468. The State of Rhode Island, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and continues to pay for services for recipients of Medicaid.

469. As a result of Defendants' actions, as set forth above, the State of Rhode Island and/or its political subdivisions have been, and continue to be, severely damaged.

470. The State of Rhode Island is entitled to a civil penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

**WHEREFORE,** Relators request the following relief:

A. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Rhode Island has sustained because of Defendants' actions, plus the maximum civil penalty allowed by law for each violation of R.I. Gen. Laws § 9-1.1-1, et seq.

B. Twenty five percent (25%) of the proceeds of this action to the Relator if the State of Rhode Island elects to intervene, and 30% if it does not;

C. Relators' attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

D. Such other relief as the Court deems just and appropriate.

## COUNT XXIII- WASHINGTON MEDICAID FRAUDE FALSE CLAIMS ACT
### Wash. Rev. Code § 74.66.010, et seq.

471. Relators incorporate Paragraphs 1 through 470 as through fully set forth herein.

472. The allegations in this count are made upon information and belief.

473. This is a claim brought by Relators on behalf of the State of Washington against Defendants pursuant to the Washington Medicaid Fraud False Claims Law for treble damages and penalties.

474. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented or caused to be presented, and are still presenting, to an employee, officer or agent of the State of Washington, or to any contractor, grantee, or other recipient of State funds, false or fraudulent claims for payment or approval, in violation of Wash. Rev. Code § 74.66.010, et seq.

475. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the Rhode Island State Government to approve or pay such false and fraudulent claims.

476. By virtue of the conduct described herein, the Defendants conspired to violate the Washington Medicaid Fraud False Claims Act.

477. By virtue of the conduct described above, Defendants violated and continue to violate the kickback prohibitions of Wash. Rev. Code Ann. § 19.68.010 and Wash. Rev. Code Ann. § 74.09.240.

478. The State of Washington, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and continues to pay for services for recipients of Medicaid.

479. As a result of Defendants' actions, as set forth above, the State of Washington and/or its political subdivisions have been, and continue to be, severely damaged.

480. The State of Washington is entitled to a civil penalty for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

**WHEREFORE,** Relators request the following relief:

A. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Washington has sustained because of Defendants' actions, plus the maximum civil penalty allowed by law for each violation Wash. Rev. Code § 74.66.010, et seq.

B. Twenty five percent (25%) of the proceeds of this action to the Relator if the State of Washington elects to intervene, and 30% if it does not;

C. Relators' attorneys' fees, litigation and investigation costs, and other reasonable expenses; and

D. Such other relief as the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

481. Relators request a trial by jury on all claims so triable.

KREINDLER & ASSOCIATES

Mitchell R. Kreindler
S.D. Texas Bar No. 32980
7676 Hillmont Street, Suite 240A
Houston, TX 77040
Tel. No.: 713.936.5531
Fax: 713.647.8889
mkreindler@blowthewhistle.com

PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP

MICHAEL A. MORSE
DOUGLAS K. ROSENBLUM
ALEXANDER M. OWENS
1818 Market St., Suite 3402
Philadelphia, PA 19103

T (215) 320-6200
F (215) 981-0082
mam@pietragallo.com
(Pro Hac Vice pending)

Date: April 17, 2018                    *Attorneys for Relators/Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that true and correct copies of the foregoing *Qui Tam* Amended

Complaint have been served upon the following on the date and in the manner listed below:

<u>**VIA FEDERAL EXPRESS**</u>

Jefferson Sessions, Esquire
Office of the Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

Kenneth Shaitelman, Esquire
Assistant United States Attorney
United States Attorney's Office
Southern District of Texas
1000 Louisiana, Suite 2300
Houston, Texas 77002

Michael A. Hoffman, Esquire
Trial Attorney
U.S. Department of Justice – Civil Division
Commercial Litigation Branch
Fraud Section
Ben Franklin Station
PO Box 261
Washington, DC 20044

Ken Paxton, Esquire
Attorney General of Texas
Office of the Attorney General
PO Box 12548
Austin, TX 78711-2548

Greg Kinskey, Esquire
Assistant Attorney General
Office of the Texas Attorney General
Civil Medicaid Fraud Division
P.O. Box 12548
Austin, Texas 78711-2548

Gurbir Grewal, Esquire
Attorney General of New Jersey
Office of the Attorney General
RJ Hughes Justice Complex
25 Market Street, Box 080
Trenton, NJ 08625-0080

Mark Herring, Esquire
Attorney General of Virginia
Virginia Attorney General's Office
202 North Ninth Street
Richmond, VA 23219

Christopher M. Carr, Esquire
Attorney General of Georgia
Office of the Attorney General
40 Capitol Square, SW
Atlanta, GA 30334

Xavier Becerra, Esquire
Attorney General of California
Attorney General's Office California
P.O. Box 944255
Sacramento, CA 94244-2550

Pam Bondi, Esquire
Attorney General of Florida
Florida Office of the Attorney General
The Capitol PL-01
Tallahassee, FL 32399-1050

Adam Paul Laxalt, Esquire
Attorney General of Nevada
100 North Carson Street
Carson City, NV 89701

Cynthia H. Coffman, Esquire
Attorney General of Colorado
Office of the Attorney General
Ralph L. Carr Judicial Building
1300 Broadway, 10th Floor
Denver, CO 80203

- 2 -

Lisa Madigan, Esquire
Attorney General of Illinois
Illinois Attorney General Office
100 West Randolph St.
Chicago, IL 60601

Curtis Hill, Esquire
Attorney General of Indiana
Indiana Attorney General's Office
Indiana Government Center South
302 W. Washington St., 5th Fl.
Indianapolis, IN 46204

Jeff Landry, Esquire
Attorney General of Louisiana
Attorney General's Office
1885 N. Third Street
Baton Rouge, LA 70802

Brian Frosh, Esquire
Attorney General of Maryland
Office of the Attorney General
200 St. Paul Place
Baltimore, MD 21202

Maura Healey, Esquire
Attorney General of Massachusetts
Office of the Attoreny General
One Ashburton Place
Boston, MA 02108-1518

Lori Swanson, Esquire
Attorney General of Minnesota
Minnesota Office of the Attorney General
445 Minnesota Street, Suite 1400
St. Paul, MN 55101

Hector Balderas, Esquire
Attorney General of New Mexico
Office of the Attorney General
Villagra Building
408 Galisteo Street
Santa Fe, NM 87501

Josh Stein, Esquire
Attorney General of North Carolina
Attorney General's Office
9001 Mail Service Center
Raleigh, NC 27699-9001

Michael J. Hunter, Esquire
Attorney General of Oklahoma
Oklahoma Attorney General's Office
313 NE 21st Street
Oklahoma City, OK 73105

Herbert H. Slatery, III, Esquire
Attorney General and Reporter of Tennessee
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202-0207

Ryan K. Patrick, Esquire
United States Attorney for the Southern District of Texas
United States Attorney's Office
Southern District of Texas
1000 Louisiana, Suite 2300
Houston, Texas 77002

Bob Ferguson, Esquire
Attorney General of Washington
Office of the Attorney General
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100

Karl A. Racine, Esquire
Attorney General for the District of Columbia
441 4th Street, NW
Washington, DC 20001

Bill Schuette, Esquire
Attorney General of Michigan
Michigan Department of Attorney General
G. Mennen William Building
525 W. Ottawa Street
P.O. Box 30212
Lansing, MI 48909

Peter Kilmartin, Esquire
Attorney General of Rhode Island
Office of the Attorney General
150 South Main Street
Providence, RI 02903


**KREINDLER & ASSOCIATES**

*and*

**PIETRAGALLO GORDON ALFANO BOSICK
& RASPANTI, LLP**


MITCHELL R. KREINDLER, ESQUIRE
KREINDLER & ASSOCIATES
S.D. Texas Bar No. 32980
7676 Hillmont Street, Suite 240A
Houston, TX 77040
Tel. No.: 713.936.5531
mkreindler@blowthewhistle.com

MICHAEL A. MORSE, ESQUIRE
DOUGLAS K. ROSENBLUM, ESQUIRE
ALEXANDER M. OWENS, ESQUIRE
PIETRAGALLO GORDON ALFANO BOSICK &
RASPANTI, LLP
1818 Market Street, Suite 3402
Philadelphia, PA 19103
Tel. No.: 215.320.6200
MAM@pietragallo.com
DKR@pietragallo.com
AMO@pietragallo.com

**Attorneys for *Qui Tam* Plaintiffs/Relators
Bhuvana Mandalapu, M.D. and
Ramakrishan Chava, M.D.**

Dated: April 17, 2018