United States Courts
Southern District of Texas
FILED

FEB 20 2020

David J. Bradley, Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

UNITED STATES OF AMERICA,
STATE OF CALIFORNIA,
STATE OF COLORADO
STATE OF GEORGIA,
STATE OF MARYLAND,
STATE OF NEVADA,
STATE OF OKLAHOMA,
STATE OF TENNESSEE, and
STATE OF TEXAS, *ex rel.*
[SUPPRESSED],

      Plaintiff,

v.

[SUPPRESSED],

      Defendants.

Case No. 4:17-cv-00740
(4:19-cv-1213)

**AMENDED COMPLAINT AND
JURY DEMAND**

**Filed Under Seal Pursuant to
31 U.S.C. § 3730(b)(2)**

# FILED UNDER SEAL
# NOT TO BE FILED
# ON PACER

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| UNITED STATES OF AMERICA, STATE OF CALIFORNIA, STATE OF COLORADO STATE OF GEORGIA, STATE OF MARYLAND, STATE OF NEVADA, STATE OF OKLAHOMA, STATE OF TENNESSEE, and STATE OF TEXAS *ex rel.* DESIREE GALES<br><br>                    Plaintiffs,<br><br>          v.<br><br>ALLIANCE FAMILY OF COMPANIES, LLC; ALLIANCE NEURODIAGNOSTICS, LLC; ALLIANCE PHYSICIAN MANAGEMENT LLC; ALLIANCE SLEEP MEDICINE, LLC; ALABAMA NEURODIAGNOSTICS LLC; CALIFORNIA NEURODIAGNOSTICS LLC; COASTAL DIAGNOSTICS GROUP, LLC; COLORADO NEURODIAGNOSTICS, LLC; DC NEURODIAGNOSTICS, LLC; DELAWARE NEURODIAGNOSTICS, LLC; GEORGIA NEURODIAGNOSTICS, LLC; HOUSTON NEURODIAGNOSTICS LLC; ILLINOIS NEURODIAGNOSTICS LLC; INDIANA NEURODIAGNOSTICS LLC; KANSAS NEURODIAGNOSTICS LLC; LOUISIANA NEURODIAGNOSTICS, LLC; MARYLAND NEURODIAGNOSTICS LLC; MASSACHUSETTS NEURODIAGNOSTICS, LLC; MICHIGAN NEURODIAGNOSTICS, LLC; MINNESOTA NEURODIAGNOSTICS, LLC; MISSISSIPPI NEURODIAGNOSTICS LLC; MISSOURI NEURODIAGNOSTICS LLC; NEVADA NEURODIAGNOSTICS LLC; NEW JERSEY NEURODIAGNOSTICS LLC; NEW MEXICO NEURODIAGNOSTICS LLC; NORTH CAROLINA NEURODIAGNOSTICS LLC; OHIO NEURODIAGNOSTICS LLC; | **Case No. 4:17-cv-00740 (4:19-cv-1213)**<br><br>**AMENDED COMPLAINT AND JURY DEMAND**<br><br>**Filed Under Seal Pursuant to 31 U.S.C. § 3730(b)(2)** |

PENNSYLVANIA NEURODIAGNOSTICS LLC;
PHOENIX NEURODIAGNOSTICS LLC;
RHODE ISLAND NEURODIAGNOSTICS LLC;
SOUTH CAROLINA NEURODIAGNOSTICS
LLC; TENNESSEE NEURODIAGNOSTICS LLC;
UTAH NEURODIAGNOSTICS, LLC; VIRGINIA
NEURODIAGNOSTICS LLC; WASHINGTON
NEURODIAGNOSTICS LLC; RESPIRATORY
SLEEP SOLUTIONS, LLC (d/b/a/ ALLIANCE
SLEEP CENTER); and
SLEEP SOURCE, LLC,

Defendants.

# AMENDED COMPLAINT

*Qui Tam* Relator Desiree Gales, by and through counsel, Kessler Topaz Meltzer & Check,

LLP and Hedrick Kring, PLLC, on behalf of the United States of America and the Plaintiff States,

brings this Amended Complaint against Defendants Alliance Family of Companies, LLC; Alliance

Neurodiagnostics, LLC, Alliance Physician Management, LLC, Alliance Sleep Medicine, LLC,

Alabama Neurodiagnostics LLC, California Neurodiagnostics, LLC, Coastal Diagnostics Group,

LLC, Colorado Neurodiagnostics, LLC; DC Neurodiagnostics, LLC; Delaware Neurodiagnostics,

LLC; Georgia Neurodiagnostics, LLC; Houston Neurodiagnostics, LLC; Illinois

Neurodiagnostics, LLC; Indiana Neurodiagnostics, LLC; Kansas Neurodiagnostics, LLC;

Louisiana Neurodiagnostics, LLC; Maryland Neurodiagnostics, LLC; Massachusetts

Neurodiagnostics, LLC; Mississippi Neurodiagnostics, LLC; Michigan Neurodiagnostics, LLC;

Minnesota Neurodiagnostics, LLC; Missouri Neurodiagnostics LLC; Nevada Neurodiagnostics

LLC; New Jersey Neurodiagnostics LLC; New Mexico Neurodiagnostics LLC; North Carolina

Neurodiagnostics LLC; Ohio Neurodiagnostics LLC; Pennsylvania Neurodiagnostics LLC;

Phoenix Neurodiagnostics LLC; Rhode Island Neurodiagnostics, LLC; South Carolina

Neurodiagnostics LLC; Tennessee Neurodiagnostics LLC; Utah Neurodiagnostics LLC; Virginia Neurodiagnostics LLC; Washington Neurodiagnostics LLC; Respiratory Sleep Solutions, LLC; and Sleep Source LLC (hereinafter the "Alliance Defendants" or "Defendants") and alleges based on direct and independent knowledge:

## I. INTRODUCTION

1. This is an action to recover treble damages and civil penalties on behalf of the United States of America and the "Plaintiff States" California, Colorado, Georgia, Maryland, Nevada, Oklahoma, Tennessee, and Texas, all in connection with an unlawful billing and kickback scheme related to neurodiagnostic testing, arising from false and fraudulent records, statements and claims made, used and caused to be made, used, and presented by the Defendants and / or their agents, employees, predecessors and co-conspirators, in violation of the federal False Claims Act, 31 U.S.C. § 3729, et seq., the federal Anti-Kickback Statute, 42 U.S.C. § 1320-7b(b), the false claims acts (or similarly named statutes) of the respective Plaintiff States, and the California Insurance Frauds Prevention Act, Cal. Ins. Code §§ 1871, et seq. ("CIFPA").

2. Defendant Alliance Family of Companies, LLC ("AFC") and its related entities (together, "the Alliance Defendants" or "Defendants"), operate as Independent Diagnostic Testing Facilities ("IDTF") and provide neurodiagnostic and sleep testing equipment and services. Throughout the relevant time period, Defendants executed a scheme to defraud federally-funded health insurance programs, including Medicare and Medicaid, the Federal Employees Health Benefits Program ("FEHB") and the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS," now known as "TRICARE"), health insurance programs funded by Medicare and the Plaintiff States, and private health insurers in California.

3

3. In particular, the Alliance Defendants have billed government healthcare programs for expensive neurodiagnostic tests, particularly at-home video EEG, routine EEG, and EKG testing, (billed under CPT codes 95951, 95957, 95816, 93224-93228, and 93272) which were (i) not medically necessary; (ii) billed in violation of applicable coding and billing rules; (iii) tainted by kickbacks; and (iv) provided in violation of Medicare's payment rules for IDTFs.

4. In addition, the Alliance Defendants defrauded Managed Medicare and Medicaid plans as well as private insurance plans in California by improperly billing for neurodiagnostic testing through an out-of-network entity in order to maximize reimbursement, without informing the patient.

5. Because Relator reported, protested against, and took efforts to stop the Alliance Defendants' unlawful practices, the Alliance Defendants retaliated against Relator by altering the terms and conditions of Relator's employment, by vastly reducing Relator's compensation and ultimately, by terminating her employment.

## II. JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over the claims brought under the False Claims Act pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. §§ 1331, 1345 and 1367. This Court has supplemental jurisdiction over the False Claims Act claims of the Plaintiff States and the claims under the CIFPA pursuant to 28 U.S.C. § 1367(a) because those causes of action are so closely related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the Constitution. Federal court jurisdiction over state law false claims is further authorized by the federal False Claims Act itself, pursuant to 31 U.S.C. § 3732(b), as the federal and state claims arise from the same transactions and occurrences.

4

7.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because the False Claims Act authorizes nationwide service of process and Defendants have sufficient minimum contacts with the United States of America.

8.     Venue lies in this District pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. §§ 1391(b) and 1391(c), because the acts proscribed by 31 U.S.C. § 3729 et seq., and complained of herein, took place in part in this District and because the Defendants transacted business in this District.

9.     In accordance with 31 U.S.C. § 3730(b)(2), this Complaint (and the original Complaint) have been filed under seal in camera and shall not be served on the Defendants until the Court so orders.

10.     Pursuant to 31 U.S.C. § 3730(b)(2), Relator served copies of the original Complaint upon the U.S. Attorney for the Northern District of Texas and the Attorney General of the United States.

11.     This suit is not based upon prior public disclosures (31 U.S.C. § 3730(e)(4)(A) (2010)) of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit, or investigation, or in a Government Accounting Office or Auditor General's report, hearing, audit, or investigation, or from the news media.

12.     To the extent that there has been a public disclosure, Relator is the original source of those allegations within the meaning of the False Claims Act. 31 U.S.C. § 3730(e)(4)(B) (2010). Relator is an "interested person" within the meanings of the CIFPA and by and through Relator's attorneys, served copies of the Complaint and written disclosure of the material evidence and information in Relator's possession concerning Defendants' violations of the CIFPA on the

District Attorney for San Mateo County and California Insurance Commissioner, pursuant to Cal. Ins. Code § 1871.7(e)(2).

## III. PARTIES

13. Plaintiff, the United States of America on behalf of its agency, the United States Department of Health and Human Services ("HHS") and its Centers for Medicare and Medicaid Services ("CMS"), administers the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, et seq. ("Medicare"), and Grants to States for Medical Assistance Programs pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 et seq. ("Medicaid").

14. Relator Desiree Gales ("Relator") is a resident of the State of Texas and a citizen of the United States.

15. Relator is a former employee of the Alliance Defendants, and worked in the company's headquarters from August 2015 until her employment was terminated in September 2018. By virtue of Relator's job responsibilities, Relator has direct and independent knowledge of the scheme set forth herein and the breadth of its operation throughout the United States.

16. Defendant Alliance Family of Companies, LLC ("AFC") is a Texas limited liability corporation, headquartered at 4545 Fuller Drive, Suite 100, Irving, TX 75038. AFC and its related entities (the "Alliance Defendants") provide neurodiagnostic testing services, including at-home video EEG monitoring and home sleep testing. The founder and CEO of the Alliance Defendants is Justin Magnuson. In September 2017, the Alliance Defendants were acquired by Ancor Capital Partners, a private equity firm.

17. In addition to AFC, the Alliance Defendants include:

(1) Alliance Neurodiagnostics, LLC ("Alliance Neuro"), a Texas limited liability corporation located at 4545 Fuller Drive, Suite 100, Irving, TX 75038. Alliance Neuro's NPI is 1912318445.

(2) Alliance Physician Management, LLC ("Alliance Physician Management"), a Texas limited liability corporation located at 4600 Fuller Drive #275, Irving, TX 75038. Alliance Physician Management's NPI is 1679964266.

(3) Alliance Sleep Medicine, LLC ("Alliance Sleep"), a Texas limited liability corporation located at 4600 Fuller Drive, Suite 100, Irving, TX 75038. Alliance Sleep's NPI is 1417248618.

(4) Respiratory Sleep Solutions, LLC ("Respiratory Sleep"), d/b/a/ Alliance Sleep Center, a Texas limited liability corporation located at 99 Trophy Club Drive Trophy Club, TX 76262. Respiratory Sleep's NPI is 1689866741.

(5) Sleep Source LLC ("Sleep Source"), a Texas limited liability corporation located at 601 Matlock Centre Circle, Arlington, TX 76015. Sleep Source's NPI is 1497037543.

(6) Alabama Neurodiagnostics LLC, a Texas limited liability corporation located at 4545 Fuller Drive, Suite 100, Irving, TX 75038. Its Alabama address is 1 Chase Corporate Center #400, Office 452, Birmingham, Alabama 35244. Alabama Neurodiagnostics' NPI is 1366803694.

(7) California Neurodiagnostics LLC, a Texas limited liability corporation located at 4545 Fuller Drive, Suite 100, Irving, TX 75038. Its address in California is 1001 Bayhill Drive #282, San Bruno, CA 94066. California Neurodiagnostics' NPI is 1932558608.

(8)    Coastal Diagnostics Group, LLC ("Coastal Diagnostics"), a Florida limited liability corporation located at 927 Beville Rd., Suite 106, South Daytona, FL 32119. Coastal Diagnostics' NPI is 1972841526.

(9)    Colorado Neurodiagnostics, LLC, a Colorado limited liability corporation located at 1675 Broadway, Suite 1200, Denver, Colorado 80202 with a principal mailing address of 4545 Fuller Drive, Suite 275, Irving, TX 75038. Colorado Neurodiagnostics' NPI is 1518352277.

(10)    Connecticut Neurodiagnostics, LLC, a Texas limited liability corporation located at 4545 Fuller Drive, Suite 100, Irving, TX 75038. Its sole member is Defendant Alliance. Connecticut Neurodiagnostics' NPI is 1366953705.

(11)    DC Neurodiagnostics, LLC, a Texas limited liability corporation located at 4545 Fuller Drive, Suite 100, Irving, TX 75038. Its practice location is 1700 Rockville Pike, Suite 400, Office 401, Rockville, MD 20852. DC Neurodiagnostics' NPI is 1255780532.

(12)    Delaware Neurodiagnostics, LLC, a Texas limited liability corporation located at 4545 Fuller Drive, Suite 100, Irving, TX 75038. Its address in Delaware is 1000 N. West Street, Suite 1200, Wilmington, DE 19801. Delaware Neurodiagnostics' NPI is 1558872994.

(13) Georgia Neurodiagnostics, LLC, a Texas limited liability corporation located at 4545 Fuller Drive, Suite 100, Irving, TX 75038. Its address in Georgia is 3295 River Exchange Drive, Suite 561-113, Norcross, GA 30092. Georgia Neurodiagnostics' NPI is 1285003350.

(14) Houston Neurodiagnostics, LLC, a Texas limited liability corporation located at 4545 Fuller Drive, Suite 100, Irving, TX 75038. Houston Neurodiagnostics' NPI is 1558770727.

(15) Illinois Neurodiagnostics, LLC, a Texas limited liability corporation located at 4545 Fuller Drive, Suite 100, Irving, TX 75038. Its address in Illinois is 2100 Manchester Road, Suite 900-107, Wheaton, IL 60187. Illinois Neurodiagnostics' NPI is 1851756191.

(16) Indiana Neurodiagnostics, LLC, a Texas limited liability corporation located at 4545 Fuller Drive, Suite 100, Irving, TX 75038. Indiana Neurodiagnostics' sole member is Defendant Alliance. Indiana Neurodiagnostics' NPI is 1023466158.

(17) Kansas Neurodiagnostics, LLC, a Texas limited liability corporation located at 4545 Fuller Drive, Suite 100, Irving, TX 75038. Kansas Neurodiagnostics' managing member is Defendant Alliance. Its Kansas address is 7300 W. 110th Street Suite 700, Office 751, Overland Park, Kansas 66210. Kansas Neurodiagnostics' NPI is 1659720316.

(18) Louisiana Neurodiagnostics, LLC, a Texas limited liability corporation located at 4545 Fuller Drive, Suite 100, Irving, TX 75038. Its Louisiana address is 301 Main Street, Suite 2200, Office 2251, Baton Rouge, LA 70801. Louisiana Neurodiagnostics' NPI is 1215471719.

(19) Maryland Neurodiagnostics, LLC, a Texas limited liability corporation located at 4545 Fuller Drive, Suite 100, Irving, TX 75038. Its Maryland address

is 1700 Rockville Pike, Suite 400, Office 401, Rockville, MD 20852. Maryland Neurodiagnostics' NPI is 1427407386.

(20) Massachusetts Neurodiagnostics, LLC, a Texas limited liability corporation located at 4545 Fuller Drive, Suite 100, Irving, TX 75038. Its address in Massachusetts is 1500 District Ave #2053, Burlington, MA 01803. Its managing member is Defendant Alliance. Massachusetts Neurodiagnostics' NPI is 1063956555.

(21) Michigan Neurodiagnostics, LLC, a Texas limited liability corporation located at 4545 Fuller Drive, Suite 100, Irving, TX 75038. Its address in Michigan is 2723 South State Street #101, Ann Arbor, MI 48104. Michigan Neurodiagnostics' sole member is Defendant Alliance. Michigan Neurodiagnostics' NPI is 1982149738.

(22) Minnesota Neurodiagnostics, LLC, a Texas limited liability corporation located at 4545 Fuller Drive, Suite 100, Irving, TX 75038. Its address in Minnesota is 860 Blue Gentian Road #220, Office 203, Eagan, MN 55121. Minnesota Neurodiagnostics' NPI is 1801331343.

(23) Mississippi Neurodiagnostics, LLC, a Texas limited liability corporation located at 4545 Fuller Drive, Suite 100, Irving, TX 75038. Mississippi Neurodiagnostics' sole member is Defendant Alliance. Mississippi Neurodiagnostics' NPI is 1942661277.

(24) Missouri Neurodiagnostics, LLC, a Texas limited liability corporation located at 4545 Fuller Drive, Suite 100, Irving, TX 75038. Missouri Neurodiagnostics' NPI is 1114377223.

10

(25) Nevada Neurodiagnostics, LLC, a Nevada limited liability corporation located at 3175 E. Warm Springs Road, Suite 121-22, Las Vegas, NV 89120. Nevada Neurodiagnostics' managing member is Defendant Alliance. Nevada Neurodiagnostics' NPI is 1447642665.

(26) New Jersey Neurodiagnostics, LLC, a Texas limited liability corporation located at 4545 Fuller Drive, Suite 100, Irving, TX 75038. Its New Jersey address is 20 Commerce Drive Suite 120, Cranford, NJ 07016. New Jersey Neurodiagnostics' NPI is 1386093052.

(27) New Mexico Neurodiagnostics, LLC, a Texas limited liability corporation located at 4545 Fuller Drive, Suite 100, Irving, TX 75038. Its New Mexico address is 150 Washington Ave, Suite 244, Santa Fe, NM 87501. New Mexico Neurodiagnostics' NPI is 1497102172.

(28) North Carolina Neurodiagnostics, LLC, a Texas limited liability corporation located at 4545 Fuller Drive, Suite 100, Irving, TX 75038. Its sole member is Defendant Alliance. Its North Carolina address is 10130 Perimeter Parkway, Suite 200, Office 250, Charlotte, NC 28216. North Carolina Neurodiagnostics' NPI is 1336595826.

(29) Ohio Neurodiagnostics, LLC, a Texas limited liability corporation located at 4545 Fuller Drive, Suite 100, Irving, TX 75038. Its Ohio address is 159 Crocker Park Blvd, Suite 400, Office 416, Westlake, OH 44145. Ohio Neurodiagnostics' NPI is 1235588906.

(30) Oklahoma Neurodiagnostics, LLC, an Oklahoma limited liability corporation located at 5350 S. Western Ave., Suite 732, Oklahoma City, OK 73128. Oklahoma Neurodiagnostics' NPI is 1760884886.

(31) Pennsylvania Neurodiagnostics, LLC, a Texas limited liability corporation located at 4545 Fuller Drive, Suite 100, Irving, TX 75038. Its Pennsylvania address is 5 Great Valley Parkway, Suite 238, Malvern, PA 19355. Pennsylvania Neurodiagnostics' NPI is 1407233109.

(32) Phoenix Neurodiagnostics, LLC, an Arizona limited liability corporation located at 34975 N. North Valley Parkway, Suite 152, Phoenix, AZ 85086. Its sole member is Defendant Alliance. Phoenix Neurodiagnostics' NPI is 1619364130.

(33) Rhode Island Neurodiagnostics, LLC a Texas limited liability corporation located at 4545 Fuller Drive, Suite 100, Irving, TX 75038. Its address in Rhode Island is 100 Dorrance Street, Suite 700, Office 707, Providence, Rhode Island 02903. Rhode Island Neurodiagnostics' NPI is 1477098911.

(34) South Carolina Neurodiagnostics, LLC, a Texas limited liability corporation located at 4545 Fuller Drive, Suite 100, Irving, TX 75038. Its address in South Carolina is 1320 Main Street, Suite 300, Office 324 Columbia, SC 29201. South Carolina Neurodiagnostics' NPI is 1699128660.

(35) Tennessee Neurodiagnostics, LLC, a Texas limited liability corporation located at 4545 Fuller Drive, Suite 100, Irving, TX 75038. Its address in Tennessee is 424 Church Street, Suite 2000, Office 2006 Nashville, TN 37219. Tennessee Neurodiagnostics' NPI is 1326497512.

(36) Utah Neurodiagnostics, LLC, a Texas limited liability corporation located at 4545 Fuller Drive, Suite 100, Irving, TX 75038. Its address in Utah is 5282 S. Commerce Drive, Suite E-170, Murray, UT 84107. Utah Neurodiagnostics' NPI is 1508235318.

(37) Virginia Neurodiagnostics, LLC, a Texas limited liability corporation located at 4545 Fuller Drive, Suite 100, Irving, TX 75038. Its address in Virginia is 440 Premier Circle, Suite 230, Charlottesville, VA 22901. Virginia Neurodiagnostics' NPI is 1891142576.

(38) Washington Neurodiagnostics, LLC, a Texas limited liability corporation located at 4545 Fuller Drive, Suite 100, Irving, TX 75038. Its address in Washington is 110 Dexter Ave, N. Suite 179, Seattle, WA 98109. Washington Neurodiagnostics' NPI is 1003263781.

18. Although the Alliance Defendants utilized sales representatives throughout the United States, the monitoring and analysis of the neurological testing data collected from patients throughout the country was primarily conducted at the Alliance Defendants' headquarters in Irving, Texas.

## IV. APPLICABLE LAW

### A. The False Claims Act

19. The federal False Claims Act and the false claims acts of the respective Plaintiff States, although enacted at different times, pertain to the same subject matter. Accordingly, Relator relates to these claims utilizing the terms of the federal False Claims Act. Moreover, the terms of the federal False Claims Act apply to all claims raised herein.

20. The federal False Claims Act provides, in pertinent part, that:

Any person who . . . (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or] (C) conspires [to do so] [or] (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

\* \* \*

is liable to the United States Government for a civil penalty of not less than [$5,500] and not more than [$11,000] [as amended] . . . plus three times the amount of damages which the Government sustains because of the act of that person.

21. For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information . . . (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1).

22. The term "claim" is defined to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property," that is made to contractors and agents of federal government programs. 31 U.S.C. § 3729(b)(2).

23. Federal law prohibits a person from knowingly presenting or causing to be presented to Medicare a claim for medical or other items or serviced that the person knows, or should know, was "not provided as claimed;" a claim for such items or services that is "false or fraudulent;" or a claim that is "for a pattern of medical or other items or services that [the] person knows or should know are not medically necessary." 42 U.S.C. §§ 1320a-71(a)(1)(A), (B) & (E).

24. Under 42 U.S.C. § 1320a-7k(d), providers are required to report any overpayments to Medicare within 60 days of the identification of the overpayment. Any overpayment retained

by a provider after the deadline of reporting and returning the overpayment is an "obligation" for purposes of the reverse false claims provision of the FCA. 42 U.S.C. § 1320a-7k(d)(3); 31 U.S.C. § 3729(b)(3).

### B. State False Claims Acts

#### i. California False Claims Act.

25. Similar to the FCA, the California False Claims Act ("CFCA") provides for treble damages and a monetary penalty of up to $10,000 on any person who: (1) knowingly presents or causes to be presented to an officer or employee of the state a false claim for payment or approval; and (2) knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state. Cal. Gov't Code § 12651(a)(1)-(2)

26. The CFCA permits a private person to bring a civil action for a violation of the CFCA on behalf of the person and the State of California. Cal. Gov't Code § 12652(c).

#### ii. Colorado Medicaid False Claims Act.

27. The Colorado Medicaid False Claims Act ("CMFCA") provides for a civil monetary penalty consistent with the federal FCA and treble damages on any person who: (1) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval or (2) knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim. Colo. Rev. Stat. Ann. § 25.5-4-305(1)(a)-(b).

28. The CMFCA permits a private person to bring a civil action for a violation of the CMFCA on behalf of the person and the State of Colorado. Colo. Rev. Stat. Ann. § 25.5-4-306.

#### iii. Georgia Taxpayer Protection False Claims Act.

29. The Georgia Taxpayer Protection False Claims Act ("Georgia FCA") provides for imposes treble damages and a civil penalty consistent with the federal FCA on any person who: (1) knowingly presents or causes to be presented to the Georgia Medicaid program a false or

fraudulent claim for payment or approval or (2) knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim. Ga. Code Ann. § 49-4-168.1(a)(1)-(2), (7).

30. The Georgia FCA permits a private person to bring a civil action for a violation of the Georgia FCA on behalf of the person and the State of Georgia. Ga. Code Ann. § 49-4-168.2.

### iv.     Maryland False Health Claims Act.

31. The Maryland False Health Claims Act ("MFHCA") provides for treble damages and a civil penalty of up to $10,000 on any person who: (1) knowingly presents or causes to be presented a false or fraudulent claim for payment or approval or (2) knowingly makes, uses, or causes to be made or used a false record or statement material to a false claim. Md. Code Ann., Health-Gen. § 2-602 (a)(1)-(2), (b)(1).

32. The MFHCA permits a private person to bring a civil action for a violation of the MFHCA on behalf of the person and the State of Maryland. Md. Code Ann., Health-Gen. §2-604(a)(1)(i).

### v.     Nevada False Claims Act.

33. The Nevada Submission of False Claims to State or Local Government Act ("Nevada FCA") provides for treble damages and a civil penalty between $5,500 and $11,000 on any person who: (1) knowingly presents or causes to be presented a false claim for payment or approval or (2) knowingly makes, uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim. Nev. Rev. Stat. Ann. § 357.040(1)(a)-(b), (2).

34. The Nevada FCA permits a private person to bring a civil action for a violation of the Nevada FCA on behalf of the person and the State of Nevada. Nev. Rev. Stat. Ann. § 357.080(1).

16

### vi.  **Oklahoma False Claims Act.**

35.  The Oklahoma Medicaid False Claims Act ("OMFCA") imposes treble damages and a civil penalty consistent with the federal FCA on any person who (1) knowingly presents or causes to be presented a false claim for payment or approval or (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim. Okla. Stat. Ann. tit. 63, § 5053.1.

36.  The OMFCA permits a private person to bring a civil action for a violation of the OMFCA on behalf of the person and the State of Oklahoma. Okla. Stat. Ann. tit. 63, § 5053.2(B).

### vii.  **Tennessee Medicaid False Claims Act and Tennessee False Claims Act.**

37.  The Tennessee False Claims Act ("Tennessee FCA") imposes treble damages and civil penalties of between $2,500 and $10,000 on any person who: (1) knowingly present or causes to be presented to an officer or employee of the state or any political subdivision thereof, a false claim for payment or approval or (2) knowingly makes, uses, or cause to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision. Tenn. Code Ann. § 4-18-103(a)(1)-(2).

38.  The Tennessee Medicaid False Claims Act ("TMFCA") imposes treble damages and civil penalties of between $5,000 and $25,000 on any person who: (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval under the Medicaid program or (2) knowingly makes, uses, or cause to be made or used a false record or statement material to a false or fraudulent claim under the Medicaid program. Tenn. Code Ann. § 71-5-182 (1)(A).

39. Both the TFCA and the TMFCA permit a private person to bring a civil action for a violation of the TFCA or TMFCA on behalf of the person and the State of Tennessee. Tenn. Code Ann. § 4-18-104(c)(1); Tenn. Code Ann. § 71-5-183(b)(1).

### viii. Texas Medicaid Fraud Prevention Act.

40. While the federal FCA imposes civil liability for the presentation of false claims to the federal government, the Texas Medicaid Fraud Prevention Act ("TMFPA") similarly imposes liability for certain "unlawful acts" pertaining to the Medicaid program in the State of Texas.

41. Under TMFPA § 36.002, a person commits an "unlawful act" and becomes liable to the State of Texas if the person:

> (1) knowingly presents, or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;
>
> (2) knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;
>
> * * *
>
> (5) except as authorized by the Medicaid program, knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or part, under the Medicaid program;
>
> * * *
>
> (7) knowingly makes or causes to be made a claim under the Medicaid program for:
>
> (A) a service or product that has not been approved or acquiesced in by a treating physician or health care practitioner;
>
> (B) a service or product that is substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry; or

(C) a product that has been adulterated, debased, mislabeled, or that is otherwise inappropriate;

42. The TMFPA provides that a person who commits an unlawful act is liable to the state for two times the amount of any payment or the value of any monetary or in-kind benefit provided under the Medicaid program, directly or indirectly, as a result of the unlawful act, including any payment made to a third party. TMFPA § 36.052(a)(1). The person is also liable for interest on any such payment and a civil penalty of between $5,500 (or the minimum amount imposed under the federal FCA) and $11,000 (or the maximum amount imposed under the federal FCA) for each unlawful act committed. *Id.* § 36.052(a)(2), (3)(B).

43. The TMFPA permits a private person to bring a civil action for a violation of § 36.002 on behalf of the person and the State of Texas. TMFPA § 36.101.

**C.** **California Insurance Frauds Prevention Act.**

44. The California Insurance Frauds Prevention Act ("CIFPA"), California Insurance Code §§ 1871 et seq., was enacted to protect and compensate California for the harm caused by insurance fraud and to assist the State in its efforts to "more effectively investigate and discover insurance frauds, and [halt] fraudulent activities." Cal. Ins. Code § 1871(a)

45. The CIFPA makes it unlawful to "employ runners, cappers, steerers, or other persons . . . to procure clients or patients to perform or obtain services or benefits under a contract or insurance or that will be the basis for a claim against an insured individual or his or her insurer," Cal. Ins. Code § 1871.7(a), creating civil liability for any person who violates that provision. Cal. Ins. Code § 1871.1(b).

46. In addition, § 1871.7(b) creates civil liability for violation of any provision of the section or of California Penal Code §§ 449-551. California Penal Code § 550 prohibits the following activities, among others:

(a)   It is unlawful to do any of the following or to aid, abet, solicit, or conspire with any person to do any of the following:

\* \* \* \* \* \*

(5) Knowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim.

(6) Knowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit.

(8) Knowingly present multiple claims for payment of the same health care benefit with an intent to defraud.

\* \* \* \* \* \*

(b) It is unlawful to do, or to knowingly assist or conspire with any person to do, any of the following:

(1) Present or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

(2) Prepare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

Cal. Pen. Code § 550.

47.   Subsection (b) of the CIFPA provides for civil recoveries against persons who violate the provisions of the Act or the provisions of California Penal Code §§ 549-551, including recovery of up to three times the amount of any fraudulent insurance claims, and fines of between $5,000 and $10,000 for each such claim. Cal. Ins. Code § 1871.7(b).

48.   The CIFPA includes *qui tam* provisions which permit "interested persons" to bring claims on behalf of the State. Cal. Ins. Code § 1871.7(e).

20

### D.    The Anti-Kickback Statute.

49.    The federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) ("AKS"), prohibits knowingly and willfully offering, paying, soliciting or receiving any remuneration to induce a person (a) to refer an individual to a person for the furnishing of any item or service covered under a federal health care program; or (b) to purchase, lease, order, arrange for or recommend any good, facility, service or item covered under a federal health care program. 42 U.S.C. § 1320a-7b(b)(1) and (2).

50.    In accordance with the Anti-Kickback Statute, Medicare and Medicaid regulations directly prohibit any provider from receiving remuneration paid with the intent to induce referrals that take into account the "volume or value" of any referrals or business generated. 42 C.F.R. § 1001.952(f). Such remuneration amounts to a kickback and can increase the expenditures paid by Government-funded health benefit programs by leading to overutilization of services and performance of medically unnecessary tests, resulting in cost and harm to federally funded health payers as well as reduction in patient choice.

51.    Compliance with the AKS is expressly and impliedly required for reimbursement of federal program claims, and claims made in violation of the law are actionable civilly under the False Claims Act. 42 U.S.C. § 1320a-7b(g) (2010) (a "claim that includes items or services resulting from a violation of . . . [the AKS] constitutes a false or fraudulent claim for purposes of [the False Claims Act]. . . ."). Further, the United States has deemed violations of the AKS to be material to its decision to pay health care claims, demonstrated in part through the requirement that providers and suppliers certify compliance with the AKS as a condition of payment under federal health care programs. If the United States had been aware that the claims discussed herein resulted from conduct that violated the AKS, the United States would not have paid the claims submitted in connection with the Defendants' unlawful conduct.

52. Claims arising from illegal kickbacks are also not authorized to be paid under state laws and regulations. States also require certifications of compliance with federal healthcare laws, including the Anti-Kickback Statute, as a condition of providing Medicaid reimbursement.

**E.      Federally Funded Health Care Programs.**

53. The United States, through HHS, administers the Medicare program, established by Title XVIII of the Social Security Act. *See* 42 U.S.C. §§ 1395 et seq. Medicare provides health insurance coverage for individuals over 65 years of age, individuals under 65 with certain disabilities, and individuals of any age with End-Stage Renal Disease.

54. Medicaid is a public-assistance program that pays for medical expenses incurred by low-income patients. The Medicaid program pays for services pursuant to plans developed by the states and approved by the U.S. Department of Health and Human Services ("HHS") through CMS. *See* 42 U.S.C. §1396a(a)-(b). States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical goods and services according to government-established rates. *See* 42 U.S.C. §1396b(a)(1), 1903(a)(1). The federal government then pays each state a statutorily determined percentage of "the total amount expended . . . as medical assistance under the State plan . . ." *See* 42 U.S.C. §1396b(a)(1).

55. TRICARE is the health care system of the United State military, designed to maintain the health of active duty service personnel, provide health care during military operations, and offer health care to non-active duty beneficiaries, including dependents of active duty personnel, military retirees and their dependents. The program operates through various military-operated hospitals and clinics worldwide and is supplemented through contracts with civilian health care providers.

56. The FEHBP provides health insurance coverage for more than 8 million federal employees, retirees, and their dependents. FEHBP is a collection of individual health care plans,

including the Blue Cross and Blue Shield Association, Government Employees Hospital Association, and Rural Carrier Benefit Plan. FEHBP plans are managed by the Office of Personnel Management,

**F.     Independent Diagnostic Testing Facilities.**

57.     Medicare pays for diagnostic tests performed by Independent Diagnostic Testing Facilities ("IDTF"). 42 C.F.R. § 410.33. Entities that perform electronic monitoring services, such as 24-hour ambulatory EKG monitoring and at-home video EEG monitoring, are classified as IDTFs and must meet all IDTF requirements. *See* Department of Health and Human Services, Medicare Learning Network ("MLN"): Independent Diagnostic Testing Facility Fact Sheet, at 6.

58.     An IDTF exists independent of a physician's office or hospital, enrolls with Medicare as a Part B supplier using a CMS-855B, and is paid under the Medicare Physician Fee Schedule ("MPFS").

59.     Medicare requires IDTFs to submit a Medicare Enrollment Application, CMS-855B, for each practice location. Each separately enrolled practice location of an IDTF must comply with the applicable IDTF requirements.

60.     In order to enroll and be eligible for payment under Medicare, IDTFs must comply with numerous certification requirements.

61.     These requirements include: utilizing qualified supervising personnel, licensed technicians, and complying with applicable state laws. 42 C.F.R. § 410.33(g).

62.     For example, an IDTF must have one or more supervising physicians who are responsible for the direct and ongoing oversight of the quality of testing performed, the proper operation and calibration of equipment used to perform tests, and the qualifications of non-physician IDTF personnel who use the equipment. 42 C.F.R. § 410.33(g); 42 C.F.R. § 410.32(b).

23

63. To qualify as a supervising physician, the physician must (1) be licensed to practice in the State(s) where the diagnostic tests he or she supervises will be performed; (2) be enrolled in Medicare (although not necessarily in the State where the IDTF is enrolled); (3) meet the proficiency tests for any diagnostic tests he or she supervises; (4) not be excluded or barred; and (5) provide general supervision for no more than three IDTF sites.

64. An IDTF that operates across multiple different states must maintain documentation that the IDTF's supervising physicians and technicians are licensed and certified in each of the States in which the IDTF operates. The multi-state IDTF must also operate in compliance with all applicable federal, state, and local licensure and regulatory requirements with regard to the health and safety of patients.

65. CMS will deny enrollment to providers who fail to meet these requirements. 42 C.F.R. 410.33(h). If the failure to meet the requirement occurs after enrollment (or CMS does not become aware of the failure until after enrollment), CMS will revoke the supplier's billing privileges. *Id.*

66. To obtain payment for services they provide to Medicare beneficiaries, Medicare enrolled providers file "claims" with the Medicare administrative contractor for their region. The basic requirement for any claim to be payable by Medicare is that the service be "reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. 1395y(a)(1)(A). In addition, to be reasonable and necessary, the service must be furnished and supervised by appropriately qualified personnel. *See* Medicare Program Integrity Manual, ch. 13 § 5.1.

67. All procedures performed by IDTFs must be specifically ordered in writing by the physician treating the beneficiary, and the IDTF may not add any procedures based on internal protocols without a written order from the treating physician. 42 C.F.R. § 410.33(d).

24

**G.    Medicare Coverage of Ambulatory EEG Testing.**

68.    An electroencephalogram ("EEG") is a test used to detect abnormalities in the electrical activity of the brain.  Brain cells communicate with one another by producing electrical impulses.  An EEG measures this electrical activity.  Specifically, electrodes that are connected to a computer are placed on the scalp.  The computer converts the electrical impulses detected by the electrodes into patterns that can be seen on the computer screen and interpreted by a doctor.

69.    EEGs are typically performed to study seizures and sleep disorders, to diagnose epilepsy, to determine if a person is brain dead, and to check for problems following a loss of consciousness.

70.    In many cases, EEGs are performed in hospitals or doctors' offices; the test takes approximately one to two hours to perform.  These are referred to as routine EEGs or "resting" EEGs.

71.    In limited situations, EEGs are performed over a 24-hour period.  For example, a 24-hour EEG may be performed as part of a comprehensive epilepsy evaluation or in intensive care units to detect seizures in comatose patients with multiple medical problems such as diabetes, renal failure, or cardiac rhythm disturbances.

72.    An EEG can also be recorded in a patient's home; this is called an ambulatory EEG ("ambulatory EEG").  Ambulatory EEG monitoring is accomplished by a recorder that continuously records brain wave patterns during 24 hours of a patient's routine daily activities and sleep.  The data is then transferred to a reading station and is interpreted by a physician.  Ambulatory EEGs are typically conducted over consecutive days.

73.    Ambulatory EEG monitoring may also be accomplished by utilizing at-home video EEG monitoring.  This monitoring involves placement of a small, flat wired disk onto the scalp and chest of a patient that feeds into a wired device which monitors the impulses from the patient's

brain and heart. The feed of this device is monitored by a physician while the patient goes about their daily routine. A video camera is also placed in the patient's home so that a doctor can monitor the patient's physical symptoms.

74. Medicare provides coverage for ambulatory EEGs and other neurodiagnostic tests only if the tests are "reasonable and necessary for the diagnosis and treatment of illness." 42 U.S.C. § 1395y(a)(1)(A). Medicare requires such diagnostic tests to be ordered in writing by a physician who is treating the beneficiary for a specific medical problem and who uses the results of the diagnostic test in the management of the beneficiary's specific medical problem. 42 C.F.R. 410.33(d). The order must specify the diagnosis or other basis for the testing. *Id.*

75. Medicare has issued a National Coverage Determination ("NCD") which limits coverage for ambulatory EEG monitoring to specific circumstances: for the diagnosis of seizure disorders in patients for whom a seizure disorder is suspected but not confirmed by medical history, physical, or routine EEG; and for the differential diagnosis between syncope (fainting) and transient ischemic attacks (mini-strokes) if not elucidated by conventional studies. NCD 160.22. In either situation, Medicare mandates that a routine or "resting EEG" always be performed before the ambulatory EEG. *Id.*

76. Medicare Advantage Plans, funded by Medicare and administered by private health insurance companies, also follow the Medicare coverage requirements for video-EEG testing. For example, the Ambulatory EEG Monitoring Policy Guideline for United Healthcare's Medicare Advantage Plan specifically follows Medicare's coverage guidelines.

77. The Medicaid programs of the Plaintiff States also had similar coverage standards for ambulatory EEGs as Medicare. For example, the Texas Medicaid program provides coverage for ambulatory EEG monitoring for patients in whom a seizure diathesis is suspected, but not

26

defined by history, physical, or resting EEG. *See* Texas Medicaid Provider Procedures Manual, Medical and Nursing Specialists, Physicians, and Physician Assistants Handbook § 9.2.25.2.

## V.    FACTUAL ALLEGATIONS

### A.    Defendants Pushed for and Billed Medically Unnecessary Neurodiagnostic Tests.

78.    Since at least May 2014, the Alliance Defendants filed and caused the filing of false claims in connection with expensive neurological diagnostic testing that was not medically necessary.

79.    The Alliance Defendants' business is based on providing expensive neurodiagnostic and sleep testing services, including at-home video EEGs, which are only medically warranted in limited circumstances. For this reason, the Alliance Defendants sought to maximize the number of at-home video EEGs, and other specialized neurological tests, that were ordered by physicians and billed by the Defendants. This was done irrespective of the specific needs of the patient. The Alliance Defendants did this in the following ways:

80.    The Alliance Defendants instructed their sales representatives to promote that physicians order 72 hours of video EEG – the highest reimbursed service – on every patient who experienced broad diagnostic symptoms, such as dizziness, memory loss, or syncope, regardless of the true medical needs of the patient.

81.    The Alliance Defendants instructed their sales force to target primary care and pain management physicians, because those physicians often were not experienced with the types of neurological tests performed by the Alliance Defendants, and therefore were most susceptible to fraudulent marketing messages.

82. As discussed in section B, *infra*, the Alliance Defendants paid physicians $500-$900 for each video EEG testing referral, either by directly paying the physicians cash for the referral or by allowing them to bill for the professional component of the test.

83. The Alliance Defendants provided physician practices with forms that promoted ordering video EEGs and other expensive neurodiagnostic tests based upon broad diagnoses rather than on the specific medical needs of the patient.

84. The Alliance Defendants provided a questionnaire for referring physicians to use in order to identify testing recipients. This questionnaire posed very general questions that are not aligned with the special diagnosis needed to justify a video EEG. For example, the questionnaire asked if the patient ever experienced "the sensation of not feeling right," "being a little confused or unsteady," or "episodes of temporary confusion or brain fog."

85. The Alliance Defendants paid for a medical assistant to go to a physician practice, meet with patients, and conduct the questionnaire with the patients, in order to encourage the physician to order video EEGs and other expensive neurodiagnostic tests where not medically necessary.

86. The Alliance Defendants instructed sales representatives to locate and identify specific patients in physician practices for the Alliance Defendants to test, by unlawfully searching the electronic medical records ("EMR") of physician practices to identify potential testing recipients. Sales representatives did this very thing: they would gain access to the EMR of targeted physician practices; search for and print a list of patients who suffered from broad diagnostic symptoms; fill out pre-printed testing order forms for those patients; and provide the orders to the physician practice's administrative staff to present to the physician to sign. In some cases, the

28

physician who signed the testing order was not even the patient's treating physician, but rather another physician who had not treated or performed an examination of the patient.

87. Contrary to Medicare's payment rules, the Alliance Defendants pushed for and billed claims for 72-hour video EEG testing even if the patient had not first undergone a resting or routine EEG and received an inconclusive diagnosis.

88. Further, because claims for video EEG would frequently be denied by both government and private insurers because a routine EEG had not been first performed, Alliance fraudulently submitted claims by simply performing routine EEG on the patient in addition to the video EEG, often on the very same day, even before the results from the routine EEG had been analyzed. Indeed, the Alliance Defendants' pre-printed order form for video EEG specifically stated that if the patient's insurance requires routine EEG to be performed prior to video EEG, the routine EEG will be performed as well.

89. For example, on May 4, 2017, the Alliance Defendants, through Ohio Neurodiagnostics LLC, submitted a claim to United Healthcare for the technical components of a video-EEG test (95951-TC), the digital analysis of the EEG test (95957-TC), as well as a routine EEG (95816-TC, with a -59 modifier) performed on a Medicare Advantage recipient on the **same day**. Ohio Neurodiagnostics received payment for these services in the amount of $1198.40 on July 8, 2017. Upon information and belief, the Alliance Defendants allowed the ordering primary care physician, Dr. N.O., to perform and bill the professional component for these tests. Thus, the Alliance Defendants sought to negate the billing rule that required the analysis of a routine EEG **prior to** ordering an expensive video EEG in only those situations where medically necessary.

90. The Alliance Defendants also tested patients who had already received 72-hour EEG monitoring within the same year.

91. Patients referred to the Alliance Defendants for at-home video EEG testing were frequently not even aware that their doctor ordered such testing at all and would often refuse to undergo the test because of its expense and intrusiveness. In such cases, an employee of the Alliance Defendants would directly call the patient or go to the patient's home and use a pre-printed script to "overcome" the patient's objections and convince the patient to go forward with the testing. Scheduling employees were paid bonuses of $25 for each testing recipient the employee was able to convince to go through with the test. In addition, the Alliance Defendants also paid its sales representatives cash bonuses of $500 for each Medicare patient tested and reimbursed.

92. On a routine basis, the Alliance Defendants put pressure on their billing and clinical review staff to push through claims for neurological tests that lacked medical necessity. The Alliance Defendants also sought to push through medically unnecessary testing claims through for payment that were legitimately stopped by Medicare, Medicaid, or a Managed Medicare or Medicaid Plan.

93. At the direction of senior management, the Alliance Defendants' sales representatives would routinely coach physicians on which diagnosis codes to use or add to the testing order in order for the claim to get paid by Medicare, Medicaid, and Managed Medicare and Medicaid plans. For example, the Alliance Defendants frequently instructed physicians to select, use, or add diagnosis codes such as R56.9 or 780.39 (unspecified convulsions), R42 (dizziness or lightheadedness), R56.1 (head injury), and R55 or 780.2 (syncope) in the testing order and clinical notes of the patient to support medical necessity and get claims paid.

94. The Alliance Defendants coached physicians to use or add these diagnosis codes even when the codes were not supported by the patient's medical history and documentation.

Instead, the Alliance Defendants instructed their sales representatives to coach physicians on what diagnosis codes to use in the testing based on what the patient's insurance would pay – not based on what the patient's medical history actually supported. The Alliance Defendants also coached physicians on what "narratives" to write in the testing order and clinical notes to support medical necessity. In addition, the Alliance Defendants also created pre-printed "addendums" to provide to physicians to sign and add to patients' clinical records so that claims for medically unnecessary neurodiagnostic tests would be approved for payment.

95. As a result, the Alliance Defendants routinely billed Medicare, Medicaid, Managed Medicare and Medicaid, and private insurance companies for video EEG testing and other EEG and EKG testing on patients for whom such testing was not medically necessary.

96. For example, the Alliance Defendants, through Coastal Diagnostics, obtained a referral from a physician assistant to perform a 72-hour EEG, routine EEG, and 72-hour EKG on a Medicare patient in Florida, based on a diagnosis of dizziness, confusion, and unsteadiness documented on a pre-printed "assessment form" provided by the Alliance Defendants. Because there was no support in the clinical notes or patient's medical history to justify the medical necessity of performing all of these expensive tests, the Alliance Defendants provided a pre-printed "clinical addendum" for the ordering physician assistant to sign which stated "Ordering 72 hour Video, Ambulatory EEG, and EKG to help evaluate symptoms patient indicated to determine whether Neurological or Cardiac event."

97. The Alliance Defendants then performed the routine EEG and first night of the video EEG on the **same day** (March 16, 2018), and billed for all three nights of video EEG testing (95951-TC), the routine EEG (95816-TC with a -59 modifier), digital analysis of the EEG (95957), and EKG testing. Contrary to Medicare's NCD, the Alliance Defendants performed and billed for

31

the three nights of video EEG testing, even though – as reflected in an Alliance neurodiagnostic report – the patient could have been diagnosed with a potential seizure disorder from the routine EEG alone. Medicare ultimately paid the Alliance Defendants, through Coastal Diagnostics, $18,227.88 for the medically unnecessary EEG testing.

**B.      Defendants Paid Kickbacks to Physicians for Referrals.**

98.      The Alliance Defendants routinely offered and paid kickbacks to physicians to induce them to order the Alliance Defendants' neurological tests.

99.      These kickbacks included:  (1) allowing ordering physicians to bill for the professional component or "interpretation" of the video EEG monitoring, when the actual interpretation was performed by an Alliance-contracted neurologist and (2) providing cash payments to ordering physicians in exchange for referrals.

100.      During sales training, the Alliance Defendants' sales representatives were instructed to promote the financial benefit of ordering the Alliance Defendants' neurological diagnostic testing to ordering physicians, including primary care physicians, pain management physicians, and neurologists.

101.      Physicians, including primary care and pain management physicians, were instructed by Alliance sales representatives that they could receive payment for providing the professional component or "interpretation" of the results of the Alliance at-home video EEG.

102.      Alliance would have ordering physicians sign a written agreement with Alliance, which specified that the ordering physician would be paid for performing the interpretation or professional component.  The agreement specified that ordering physicians could either bill the professional component themselves (with Alliance providing necessary billing codes and assistance), or allow Alliance to bill the professional component and receive $500-$900 for the referral, if the physician did not wish to perform the billing.

32

103. The Alliance Defendants promoted that the interpretation would only take a few minutes to complete and involved reviewing the completed test result report prepared by Alliance, and deciding whether the patient needed to be treated or referred to a specialist.

104. While Alliance Defendants allowed ordering primary care and pain management physicians to bill Medicare, Medicaid, and private insurance companies for the professional component of the test – or paid them for the interpretation directly – the actual interpretation of the test results was already completed by an Alliance contracted neurologist, internally referred to as the "over reading" physician.

105. In fact, the Alliance Defendants provided each ordering physician with a "neurologist technical report" or "neurodiagnostic report" that included the Alliance-contracted neurologist's conclusions about the test. This interpretation would be completed by the Alliance-contracted neurologist **before** being sent to the ordering physician. In at least some circumstances, as discussed in Section D, *infra*, the Alliance contracted neurologist would not even complete the report at all. Rather, an Alliance technologist would copy language from an earlier report completed by the neurologist and electronically sign the neurologist's name before providing the report to the ordering physician.

106. Thus, to perform the "interpretation," the ordering physician would merely have to review the completed test report and write one sentence at the bottom of the report agreeing with the Alliance contracted neurologist's conclusions, and summarizing the next steps. Then, to bill for the professional component, physicians would bill the patient's insurance (including Medicare, Medicaid, and Managed Medicare and Medicaid plans) for the video EEG test. This bill would be submitted with a "-26 modifier" (for example: "95951-26"), falsely indicating that the physician had personally performed the interpretation, when, in fact, the work had been done by Alliance.

107. For example, in the case of the patient described in paragraphs 96 and 97, *infra*, the Alliance Defendants allowed a physician at the ordering physician assistant's practice to bill for the "interpretation" of the routine EEG and video EEG, even though the actual interpretation was performed by an Alliance-contracted neurologist. The Alliance Defendants provided the physician with a neurodiagnostic report which included the Alliance-contracted neurologist's assessment and interpretation of the EEG. At the bottom of the report, the physician merely wrote one sentence agreeing with the neurologist's assessment and signed his name, and then was able to bill for the interpretation.

108. Sales representatives of the Alliance Defendants trained primary care physicians on how to perform the "interpretation" – meaning, how to write a few sentences agreeing with the neurologist's conclusion and summarizing next steps. For example, the Alliance Defendants provided sales representatives with a summary of examples of 72-hour ambulatory EEG "interpretations" that could be shared with ordering primary care physicians to help them complete this report so they could bill the professional component.

109. Even if the ordering physician did not want to bill for the interpretation, the Alliance Defendants would still pay the physician $500-$900, simply for ordering the test. The Alliance Defendants would then allow an Alliance-contracted neurologist to bill for the professional component or would bill the professional component for such tests directly through Defendant Sleep Source (for non-Medicare claims). Because primary care and pain management doctors were specifically targeted by Alliance and were not familiar or comfortable with billing for neurological testing, they frequently accepted the $500-$900 referral fee, rather than do the billing themselves.

**C.** **Alliance Defendants' Billing Scheme with Specific Neurology Practices.**

110. The Alliance Defendants engaged in a billing scheme with specific neurologists neurology practices, including T.N., S.L., K.C., B.S., C.T., and J.D., in order to receive higher reimbursement from a patient's insurance and to bill the insurance of testing recipients for which the Alliance Defendants' entities were out-of-network.

111. Under this scheme, these neurologists and neurology practices agreed to act as a billing front for the Alliance Defendants, by using their billing numbers to bill Medicare Managed Medicare and Medicaid Plans, as well as private insurance companies in California, for both the professional component and technical component of Alliance Defendants' neurological tests.

112. In fact, only the professional component was performed by the neurologists. The technical component was solely conducted by the Alliance Defendants, as the Alliance Defendants would purportedly "lease" their testing equipment and technologists to the neurology practice to set-up the patient for the test. The neurology practice would not pay anything to the Alliance Defendants for this "lease" and instead would bill the patient's insurance as if the practice performed both the technical and professional component of the test. Moreover, the place of service on these tests was listed as the neurology practice's office, even though the test was performed in the patient's home.

113. In exchange, the Alliance Defendants agreed to allow the neurologists to keep 20% of the technical component reimbursement received from the insurance. The neurologists were expected to send the remaining 80% back to the Alliance Defendants.

**D.** **Alliance Defendants' Violations of IDTF Requirements.**

114. From May 2014 through the present, the Alliance Defendants have violated Medicare's IDTF enrollment, supervision and licensing requirements.

115. In particular, although the Alliance Defendants operated as an IDTF throughout the country, only a few of the Alliance Defendants are actually enrolled as IDTFs with Medicare. For example, the Alliance Defendants are enrolled as IDTFs in the states of Texas, California, Oklahoma, Pennsylvania and Florida. Nevertheless, throughout the relevant time period, the Alliance Defendants billed for the neurodiagnostic testing of patients through entities that were not enrolled as IDTFs in the state where testing recipients were located or through entities that were not enrolled as IDTFs at all, in order to maximize reimbursement. The Alliance Defendants also violated Medicare's billing requirements for IDTFs by billing as if the Place of Service for its neurodiagnostic testing was conducted in office (POS-11) even though the testing was actually conducted in the patient's home.

116. The Alliance Defendants instructed its billing staff to bill Medicare using the NPI of whichever entity received the maximum reimbursement from Medicare, regardless of whether the entity was properly licensed as an IDTF in the testing recipient's state.

117. For example, on May 4, 2018, the Alliance Defendants billed Medicare $33,000 for a 48-hour video EEG conducted on a Medicare recipient located in Michigan through its Pennsylvania Neurodiagnostics NPI, even though Pennsylvania Neurodiagnostics was not licensed as an IDTF in Michigan. In addition, the Alliance Defendants billed as if the patient received Medicare in Pennsylvania even though the patient was located in Michigan.

118. The Alliance Defendants also violated the IDTF supervision and licensing requirements by billing for the testing of patients without having **any** supervising physicians that were responsible for overseeing and training the technologists who were responsible for analyzing the testing data, as well as monitoring and calibrating the testing equipment.

119.    Although the Alliance Defendants listed certain neurologists as being "supervising" physicians on their IDTF enrollment applications, based on Relator's observations, technologists were neither trained nor supervised by any physician at all.  Moreover, Relator was not aware of any physician that monitored or calibrated the testing equipment.

120.    .In further violation of Medicare's IDTF requirements, frequently the physicians who were nominally listed as "supervising" physicians, were not even licensed in the state where the testing was performed.

121.    As discussed in Section B, *infra*, although Alliance contracted with neurologists to analyze and interpret the results of its tests and prepare a report to provide to ordering physicians, in some cases, this report would solely be completed by an Alliance technologist.  Indeed, in order to speed up the billing process, Alliance technologists were instructed to copy language from an earlier report completed by the Alliance neurologist, sign the neurologist's name on the report using the neurologist's electronic signature, and then provide the report to the ordering physician so that Alliance could bill for the technical component of the test.

E.      **Alliance Defendants' Out of Network Billing Scheme.**

122.    The Alliance Defendants also engaged in an unlawful billing scheme to maximize reimbursement by billing a testing recipient's insurance – including Managed Medicare and Medicaid plans and private insurance plans in California – through an entity that was "out-of-network" or not contracted with the patient's insurance.

123.    By billing out-of-network, the Alliance Defendants were able to charge much higher rates for their neurological diagnostic tests than they would otherwise be able to if they billed under an in-network entity, under the contracted for rate.

124.    Before billing for a test, an employee of the Alliance Defendants would check the insurance of the testing recipient to decide which of the Alliance Defendants' provider numbers to

37

use to bill the patient's insurance. If a patient had out-of-network benefits and one of the Alliance entities was out of network with that patient's insurance, the Alliance Defendants billed under that entity's billing number to receive greater reimbursement. In so doing, Managed Medicare and Medicaid plans as well as private insurance companies in California paid more for the Alliance Defendants' tests than they otherwise would have.

125. In fact, the Alliance Defendants routinely billed out-of-network even if another Alliance entity was in network with the patient's insurance company. When billing out-of-network in this manner, the Alliance Defendants failed to inform the testing recipient, even though the out-of-pocket cost-sharing for the testing recipient would be extremely high.

126. In such cases, the Alliance Defendants sometimes attempted to collect the patient's cost-sharing amount, but frequently waived the patient's cost-sharing amount completely because of the higher reimbursement received from the insurance company for out-of-network bills.

**F.** **The Alliance Defendants Failed to Repay Home Sleep Studies Conducted in Florida.**

127. From the time the Alliance Defendants acquired Defendant Coastal Diagnostics in October 2015 until at least February 2018, the Alliance Defendants also provided and billed Medicare and Managed Medicare plans for home sleep testing services in the state of Florida through Defendant Coastal Diagnostics.

128. The Alliance Defendants provided and billed for home sleep testing in Florida, even though Coastal Diagnostics is not licensed to conduct home sleep studies and does not have any qualified supervising physician to oversee home sleep studies.

129. As a result, the Alliance Defendants received funds from Medicare for services they were not entitled to receive. Under federal law, the Alliance Defendants were obligated to report and return the overpayment for these services to Medicare within 60 days after the overpayments

38

were identified or should have been identified with reasonable diligence. 42 U.S.C. § 1320a-7k(d); 42 C.F.R. 401.305(b)(1).

130. Although the Alliance Defendants have since stopped conducting home sleep studies in Florida, they have still not repaid the reimbursement they received from Medicare for such improperly performed, unlicensed tests.

**G. The Alliance Defendants' Retaliation Against Relator.**

131. In August of 2015, Relator began working for Alliance Defendants as a Patient Clinical Coordinator in the Alliance Defendants' sales division. In this role, Relator was eligible for both a departmental bonus based on certain department sales thresholds and a monthly personal performance bonus.

132. Because of Relator's clinical background, as part of her job duties, Relator was tasked with performing clinical reviews of certain neurodiagnostic testing referrals, as well as with educating and training Alliance Defendants' sales representatives and clinical reviewers on clinical notes, insurance, and diagnostic code requirements.

133. As an employee of the Alliance Defendants, Relator became aware of the Alliance Defendants' fraudulent billing.

134. On numerous occasions, Relator reported her concerns about the Alliance Defendants' fraudulent testing and billing practices to supervisors, senior management, Human Resources, and the compliance department.

135. For example, on December 5, 2015, Relator emailed Alliance Defendants' senior management regarding the lack of documentation to support the medical necessity of a 72-hour VEEG. In response, Alliance Defendants' senior management instructed Relator not to question the necessity of the order.

136. Concerned by the response she received, Relator relayed the exchange to the Alliance Defendants' Human Resources department on December 11, 2015. In her email to Human Resources, Relator also reported that claims were being billed without documented medical support in violation of Medicare billing rules.

137. Relator continued to raise concerns about unlawful testing and billing practices. Relator's supervisors and management, however, did not heed these concerns and demanded that Relator stop questioning their practices.

138. Senior management also demanded that Relator curtail clinical review in order to expedite billing testing orders to Medicare, Medicaid, and private insurance, notwithstanding that medical documentation did not support the orders.

139. For example, on February 28, 2017, Relator specifically flagged a referral for a 72-hour video-EEG test as lacking documentation to support medical necessity because the physician ordered only 24-hour monitoring. Senior management informed Relator that insurance would approve an order for 72-hour monitoring, despite the conflict with the physician's direct orders. Relator was instructed to be cognizant of that fact moving forward.

140. Nevertheless, Relator continued to elevate concerns to management.

141. As a result of Relator's reporting, the Alliance Defendants unlawfully retaliated against Relator by taking away Relator's job responsibilities, threatening Relator's job security, and decreasing Relator's compensation by thousands of dollars per month.

142. In early 2017, one of Alliance Defendants' senior managers approached Relator and repeatedly tried to get Relator to state that she was overwhelmed with clinical review work and that another employee should take over her clinical review responsibilities. When Relator refused to agree that her responsibilities should be taken away, the senior manager angrily

responded that if Relator would not follow his directives, she would not be included in company discussions moving forward.

143. In early 2017, the Alliance Defendants' senior managers transferred most of Relator's clinical review responsibilities to a non-clinically trained employee who lacked expertise in medical documentation and medical necessity criteria, but who was willing to follow management's directives. The Alliance Defendants provided the new clinical reviewer with a laptop to conduct paid clinical review work from home, while Relator was never provided with a laptop or paid for time she worked from home.

144. In addition, Relator's supervisor sent out a company-wide email instructing employees not to ask Relator about clinical review questions.

145. When senior management instructed Relator to train the new, non-clinically trained employee on how to ensure testing orders were paid, Relator stated that she would not direct a non-clinically trained employee to violate Medicare billing rules.

146. Without explanation, in April of 2017, the Alliance Defendants did not provide Relator with a personal performance bonus, thereby reducing her overall compensation. Other employees in Relator's department continued to receive both a personal performance bonus and a departmental bonus.

147. Nevertheless, Relator continued to report her concerns about improper billing practices to the Alliance Defendants' management.

148. In February of 2018, Relator requested a pay increase and promotion. In March 2018, while Relator received a new job title and a nominal increase in hourly pay, her overall compensation was further reduced, because the Alliance Defendants capped the bonus she was

eligible to receive. Other employees in Relator's department continued to receive the full individual performance bonus and a departmental bonus.

149. In early September 2018, the Director of Finance called Relator into a meeting and informed Relator that, per the instructions of the Alliance Defendants' senior management, Relator was to stop documenting the deficiencies she identified in the clinical documentation of testing orders. Relator refused.

150. On September 11, 2018, shortly after Relator met with the Director of Finance regarding her documentation practices, the Alliance Defendants' Human Resources department called Relator to a meeting and terminated her employment without explanation.

151. One day after Alliance Defendants terminated Relator's employment, the Alliance Defendants issued a company-wide email ordering employees to refuse to speak to Relator and to inform Human Resources if Relator attempted contact.

152. The Alliance Defendants continued to retaliate against Relator even after her employment ended by informing prospective employers in job reference discussions that Relator was terminated for misconduct, even though Relator was actually terminated for her reporting of fraudulent billing practices.

153. As a result of the Alliance Defendants' unlawful termination of Relator's employment, Relator suffered loss of income, periods of joblessness, and emotional distress.

## VI. CLAIMS FOR RELIEF

### FIRST COUNT

**VIOLATIONS OF FALSE CLAIMS ACT – PRESENTING FALSE CLAIMS**
**[31 U.S.C. § 3729(a)(1) (2008), and, as amended, 31 U.S.C. § 3729(a)(1)(A)]**

154. Relator re-alleges and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

155. This is a claim for treble damages and civil penalties under Section 31 U.S.C. § 3729(a)(1)(A).

156. By virtue of the acts alleged herein, Defendants have knowingly presented or caused to be presented to officers or employees of the United States government false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

157. The United States, unaware of the false and fraudulent nature of these claims, paid these claims, which otherwise would not have been paid.

158. By reason of the false or fraudulent claims, the United States has sustained damages, and continues to sustain damages, in a substantial amount.

## SECOND COUNT

### VIOLATIONS OF FALSE CLAIMS ACT – MAKING OR USING RECORD OR STATEMENT TO CAUSE FALSE CLAIM TO BE PAID
### [31 U.S.C. § 3729(a)(1)(B)]

159. Relator re-alleges and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

160. This is a claim for treble damages and civil penalties under 31 U.S.C. § 3729(a)(1)(B).

161. By virtue of the acts alleged herein, the Defendants have knowingly made, used, or caused to be made or used false records or statements – to include false certifications and representations made or caused to be made by Defendants, to get false or fraudulent claims paid or approved by the government in violation of 31 U.S.C. § 3729(a)(1)(B).

162. By reason of the false or fraudulent claims, the United States has sustained damages, and continues to sustain damages, in a substantial amount.

<h2 style="text-align:center"><strong><u>THIRD COUNT</u></strong></h2>

<strong>VIOLATIONS OF FALSE CLAIMS ACT – CONSPIRACY<br>[31 U.S.C. § 3729(a)(1)(C)]</strong>

163. Relator re-alleges and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

164. By virtue of the acts alleged herein, the Defendants conspired to get false or fraudulent claims paid by the United States and performed one or more acts to effect payment of false or fraudulent claims by the United States, 31 U.S.C. § 3729(a)(1)(C).

<h2 style="text-align:center"><strong><u>FOURTH COUNT</u></strong></h2>

<strong>VIOLATIONS OF FALSE CLAIMS ACT – REVERSE FALSE CLAIM<br>[31 U.S.C. § 3729(a)(1)(G)]</strong>

165. Relator re-alleges and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

166. By virtue of the acts alleged herein, the Defendants knowingly concealed and knowingly and improperly avoided an obligation to repay money owed to the United States for neurodiagnostic and home sleep testing services that were tainted by kickbacks, were not reasonable and necessary, and/or were provided in violation of Medicare's licensing and supervision requirements for IDTFs, in violation of 31 U.S.C. § 3729(a)(1)(G).

<h2 style="text-align:center"><strong><u>FIFTH COUNT</u></strong></h2>

<strong>VIOLATIONS OF FALSE CLAIMS ACT – RETALIATION AGAINST RELATOR<br>[31 U.S.C. § 3730(h)]</strong>

167. Relator re-alleges and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

168. By virtue of the acts particularly set forth in the foregoing paragraphs, the Defendants unlawfully retaliated against Relator in violation of 31 U.S.C. § 3730(h), including by

44

altering the terms and conditions of Relator's employment, vastly reducing Relator's compensation, and terminating Relator's employment after Relator had lawfully investigated, reported, and protested against Defendants' unlawful practices.

169. Plaintiff seeks reinstatement, compensatory damages (including two times the amount of backpay and interest), special damages, attorneys' fees and litigation costs, and other appropriate statutory relief pursuant to this section.

## SIXTH COUNT

### California False Claims Act
### Cal. Gov't Code §§ 12650 – 12656

170. This is a claim for treble damages and civil penalties under the California False Claims Act, Cal. Gov't Code §§ 12650 – 12656. Relator re-alleges and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

171. Defendants violated the California False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly submitting or causing the submission of false claims to the State of California as described herein.

172. As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of California.

173. The State of California, unaware of the false or fraudulent nature of these claims, paid such claims which the State of California would not otherwise have paid.

174. By reason of these payments, the State of California has been damaged, and continues to be damaged, in a substantial amount.

## SEVENTH COUNT

### Colorado Medicaid False Claims Act
### Col. Rev. Stat. §§ 25.5-4-303.5 et seq.

175.  This is a claim for treble damages and civil penalties under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. §§ 25.5-4-303.5 et seq. Relator re-alleges and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

176.  Defendants violated the Colorado Medicaid False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly submitting and causing the submission of false claims to the State of Colorado, as described herein.

177.  As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Colorado.

178.  The State of Colorado, unaware of the false or fraudulent nature of these claims, paid such claims which the State of Colorado would not otherwise have paid.

179.  By reason of these payments, the State of Colorado has been damaged, and continues to be damaged, in a substantial amount.

## EIGHTH COUNT

### Georgia State False Medicaid Claims Act
### Ga. Code §§ 49-4-168 et seq.

180.  This is a claim for treble damages and civil penalties under Georgia State False Medicaid Claims Act, Ga. Code §§ 49-4-168 et seq. Relator re-alleges and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

181.  Defendants violated the Georgia State False Medicaid Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly submitting and causing the submission of false claims to the State of Georgia, as described herein.

46

182. As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Georgia.

183. The State of Georgia, unaware of the false or fraudulent nature of these claims, paid such claims which the State of Georgia would not otherwise have paid.

184. By reason of these payments, the State of Georgia has been damaged, and continues to be damaged, in a substantial amount.

## NINTH COUNT

### Maryland False Health Claims Act of 2010
### Md. Code Ann., Health-General §§ 2-601 et seq.

185. This is a claim for treble damages and civil penalties under the Maryland False Health Claims Act of 2010, Md. Code Ann., Health-General §§ 2-601 et seq. Relator re-alleges and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

186. Defendants violated the Maryland False Health Claims Act of 2010 by engaging in the fraudulent and illegal practices described herein including knowingly submitting and causing the submission of false claims to the State of Maryland, as described herein.

187. As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Maryland.

188. The State of Maryland, unaware of the false or fraudulent nature of these claims, paid such claims which the State of Maryland would not otherwise have paid.

189. By reason of these payments, the State of Maryland has been damaged, and continues to be damaged, in a substantial amount.

## TENTH COUNT

### Nevada False Claims to State or Local Government Act
### Nev. Rev. Stat. Ann. §§ 357.010 – 357.250

190. This is a claim for treble damages and civil penalties under the Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. Ann. §§ 357.010 – 357.250. Relator re-alleges and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

191. Defendants violated the Nevada Submission of False Claims to State or Local Government Act by engaging in the fraudulent and illegal practices described herein, including knowingly submitting and causing the submission of false claims to the State of Nevada, as described herein.

192. As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Nevada.

193. The State of Nevada, unaware of the false or fraudulent nature of these claims, paid such claims which the State of Nevada would not otherwise have paid.

194. By reason of these payments, the State of Nevada has been damaged, and continues to be damaged, in a substantial amount.

### ELEVENTH COUNT

### Oklahoma Medicaid False Claims Act
### Okl. Stat. Title 63 §§ 5053 et seq.

195. This is a claim for treble damages and civil penalties under the Oklahoma Medicaid False Claims Act, Okl. Stat. Title 63 §§ 5053 et seq. Relator re-alleges and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

196. Defendants violated the Oklahoma Medicaid False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly submitting and causing the submission of false claims to the State of Oklahoma, as described herein.

197. As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Oklahoma.

198. The State of Oklahoma, unaware of the false or fraudulent nature of these claims, paid such claims which the State of Oklahoma would not otherwise have paid.

199. By reason of these payments, the State of Oklahoma has been damaged, and continues to be damaged, in a substantial amount.

## TWELFTH COUNT

**Tennessee False Claims Act, Tenn. Code Ann. §§ 4-18-101 et seq.**
**Tennessee Medicaid False Claims Act, Tenn. Code. Ann. §§ 71-5-181 et seq.**

200. This is a claim for treble damages and civil penalties under the Tennessee False Claims Act, Tenn. Code Ann. §§ 4-18-101 et seq. and the Tennessee Medicaid False Claims Act, Tenn. Code. Ann. §§ 71-5-181 et seq. Relator re-alleges and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

201. Defendants violated the Tennessee False Claims Act and Texas Medicaid False Claims Act by engaging in the fraudulent and illegal practices described herein, including knowingly submitting and causing the submission of false claims to the State of Tennessee, as described herein.

202. As a result of the misconduct alleged herein, Defendants knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Tennessee.

203. The State of Tennessee, unaware of the false or fraudulent nature of these claims, paid such claims which the State of Tennessee would not otherwise have paid.

204. By reason of these payments, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount.

## THIRTEENTH COUNT

### Texas Medicaid Fraud Prevention Act
### Tex. Hum. Res. Code Ann. §§ 36.001 – 36.132

205. This is a claim for treble damages and civil penalties under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. §§ 36.001 – 36.132. Relator re-alleges and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

206. Defendants violated the Texas Medicaid Fraud Prevention Act by engaging in the fraudulent and illegal practices described herein, including by knowingly paying kickbacks to healthcare providers and by knowingly submitting and causing the submission of false claims to the State of Texas, as described herein.

207. As a result of the misconduct alleged herein, Defendants engaged in unlawful acts prohibited by the Texas Medicaid Fraud Prevention Act and knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Texas.

208. The State of Texas, unaware of the false or fraudulent nature of these claims, paid such claims which the State of Texas would not otherwise have paid.

209. By reason of these payments, the State of Texas has been damaged, and continues to be damaged, in a substantial amount.

50

## FOURTEENTH COUNT

### California Insurance Frauds Protection Act
### Cal. Ins. Code §§ 1871 et seq.

210. This is a claim for treble damages and penalties under the California Insurance Frauds Prevention Act, Cal. Ins. Code §§ 1871 et seq., as amended. Relator re-alleges and incorporates the allegations in the preceding paragraphs as if set forth fully herein.

211. As described in this Complaint, Defendants knowingly employed "runners, cappers, steerers, or other persons to procure clients or patients to perform or obtain services or benefits . . . or to procure clients or patients to perform or obtain services or benefits under a contract of insurance," in violation of Cal. Ins. Code § 1871.7(a).

212. Kickbacks offered to induce claims for Defendants' neurodiagnostic testing to be submitted to private insurers constitutes the employment of persons "to procure clients or patients to perform or obtain services or benefits under a contract or insurance," in violation of the CIFPA.

213. Defendants also violated the California Insurance Frauds Prevention Act by engaging in the fraudulent and illegal practices described herein, including: knowingly preparing, making, or subscribing writings, with the intent to present or use, or allow such writings to be presented, in support of false or fraudulent claims in violation of Penal Code § 550(a)(5); knowingly presenting or causing to be presented, false or fraudulent claims for health care benefits in violation of Penal Code§ 550(a)(6); and knowingly presented claims for payment for medically unnecessary neurodiagnostic testing and by instructing and rewarding its commissioned sales consultants for the promotion of medically unnecessary testing in violation of Penal Code § 550(a)(8).

214. Each claim for reimbursement that resulted from Defendants' illegal practices represents a false or fraudulent record or statement, and a false or fraudulent claim for payment.

Private insurers, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continue to pay the claims that would not be paid but for Defendants' unlawful conduct.

215. By reason of these payments, private insurers and the People of the State of California have been damaged, and continue to be damaged, in a substantial amount.

## V.    <u>CLAIMS FOR RELIEF</u>

WHEREFORE, Relator requests the following relief:

A.    An Order requiring Defendants to cease violations of the federal False Claims Act, the California Insurance Frauds Prevention Act, the false claims acts of the Plaintiff States, and the Anti-Kickback Statute;

B.    An Order granting judgment against Defendants for three times the amount of damages the United States has sustained because of Defendants' actions, plus the maximum authorized civil penalty for each and every false claim that Defendants caused to be presented to the United States and/or its grantees;

C.    An Order granting judgment against Defendants for three times the amount of damages each of the Plaintiff States has sustained because of Defendants' actions, plus the maximum authorized civil penalty for each and every unlawful act Defendants committed and/or each and every false claim that Defendants presented or caused to be presented to each of the Plaintiff States and/or its grantees;

D.    An Order granting judgment against Defendants for three times the amount of damages sustained by the private insurers and people of the State of California because of Defendants' actions, plus the maximum authorized civil penalty for each and every false claim that Defendants caused to be presented to each private insurer;

E.  An Order awarding to Relator the maximum amount allowed as a "Relator's Share" pursuant to: 31 U.S.C. § 3730(d) of the federal False Claims Act, Cal. Ins. Code § 1871.7(g), and each of the statutes set forth above for the false claims acts of the Plaintiff States;

F.  An Order awarding Relator such relief as is appropriate under the provisions of 31 U.S.C. § 3730(h) of the False Claims Act for retaliation, including:

(1) compensatory damages, including two times the amount of back pay with appropriate interest including pre-and post-judgment interest;

(2) reinstatement;

(3) compensation for special damages, including damages for emotional distress, sustained by Relator in an amount to be determined at trial;

(4) litigation costs and reasonable attorney's fees; and

(5) such punitive damages as may be awarded under applicable law.

G.  An Order awarding to Relator from Defendants all reasonable expenses that were necessarily incurred, plus reasonable attorneys' fees and costs; and,

H.  An Order awarding to the United States, the Plaintiff States and Relator all such other relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury as to all issues.

DATED, this 20th of February, 2020.

Respectfully submitted,

HEDRICK KRING, PLLC

By:    */s/ Joshua L. Hedrick*

Joshua L. Hedrick
Texas Bar No. 24061123
1700 Pacific Ave, Suite 4650
Dallas, TX 75201
Phone: 214-880-9600
Facsimile: 214-481-1844
Josh@hedrickkring.com

KESSLER TOPAZ
MELTZER & CHECK, LLP
David A. Bocian (*pro hac vice* pending)
Asher Alavi (*pro hac vice* pending)
280 King of Prussia Rd.
Radnor, Pennsylvania 19087
(610) 667-7706
aalavi@ktmc.com
dbocian@ktmc.com
www.ktmc.com

*Attorneys for Relator*